[Crim. No. 21126. Dec. 29, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVIE LAMAR FIELDS, Defendant and Appellant.

330

332

334

## COUNSEL

Allen Ruby, under appointment by the Supreme Court, and Morgan, Ruby, Teter, Schofield, Franich, Bouchier & Fredkin for Defendant and Appellant.

Quin Denvir, State Public Defender, Michael G. Millman and Joseph Levine, Deputy State Public Defenders, Samuel R. Gross and Robert C. Vanderet as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROUSSARD, J.**—This case arises on an automatic appeal from a death sentence imposed under the 1977 death penalty statute. (Former Pen. Code, § 190 et seq.; Stats. 1977, ch. 316.) As is typical in automatic appeals, the case raises a variety of contentions, some presenting issues of general import while others involve matters relevant only to this particular appeal.

Among the more important issues are: (1) whether the exclusion of jurors who would automatically vote against the death penalty denies defendant a representative jury at the guilt phase of the trial; (2) whether a person who states that he could not vote for the death penalty in the case before him, but might conceivably in another case, can be excluded from the jury; (3) whether the execution-murder of a robbery victim after the killer has secured possession of the victim's property can fall within the special circumstance of murder "during the commission" of a robbery; and (4) whether a psychopath is legally insane. We have reviewed these and all other issues raised by defendant, and find no prejudicial error in the proceedings below. We therefore affirm the judgment finding defendant guilty of first degree murder, with the special circumstance of murder during the commission of a robbery, and imposing the death penalty.

## I. *Summary of proceedings.*

On September 13, 1978, defendant was paroled from prison after serving a sentence for manslaughter. In the next three weeks, he became a one-man crime wave. He was eventually convicted in this proceeding of the following offenses: The robbery murder of Rosemary C., with the special circumstance of willful, deliberate, and premeditated murder during the commission of a robbery; the robbery of Clarence G.; the kidnaping for robbery and forced oral copulation of Cynthia S.; the kidnaping for robbery and robbery of Gwendolyn B., as well as rape, forcible oral copulation, and assault with a deadly weapon on Gwendolyn; the kidnaping, robbery, forcible oral copulation, and rape of Colleen C.

The jury determined that defendant was sane, and fixed the punishment at death. The trial court denied defendant's motion for new trial and for modification of the verdict. The case comes to us on automatic appeal.

## II. *Summary of the evidence.*

### (a) *The murder and robbery of Rosemary C.*

Rosemary C. was a 26-year-old black woman who worked as a student librarian at the University of Southern California. On September 27, Gail Fields, defendant's sister, saw Rosemary and defendant at the Fields residence. The next morning Gail entered defendant's bedroom; defendant was standing by the door and Rosemary was naked in the bed. Defendant handed Gail a check signed by Rosemary C. for $185. Defendant then examined Rosemary's checkbook and said that she probably had more money. Defendant called Rosemary a "bitch" and told her to write another check for $222 and some cents. He then told Rosemary he would "bump her off"

because "she run a game on him," by writing a check for less than the balance of her account. Gail took the $222 check, cashed it at a bank, and gave the money to defendant, who returned $22 to her.

About 1 p.m. on September 28, Debbie M., a 16-year-old girl who was the former girlfriend of defendant's brother, went to the Fields residence. Debbie saw Rosemary and defendant go into defendant's bedroom. A short while later, defendant came out and asked Debbie if she wanted to see how he punished his girl friends. Debbie said "no," but defendant pushed her to the bedroom door where she saw Rosemary naked and bound to the bed. A short while later Debbie saw defendant enter the bedroom with a gun, tell Rosemary that he would kill her if she did not give him money, and say that he was going to take her on a long trip "and she wasn't never going to come back."

Later in the afternoon Gail borrowed a car from Clifton B., Debbie's godfather. Debbie saw defendant, Gail, and Rosemary leave the house; Rosemary was dressed and carrying her purse. Gail testified that defendant and Rosemary got in the back seat of B.'s car. Defendant told Gail to drive them toward the Santa Monica freeway. As the car entered the on-ramp, Gail heard a shot. Rosemary cried out, "Oh, God." Defendant told Gail to keep on driving. Gail heard more shots. Defendant then said that Rosemary was not dead and he had to make sure she was dead. Gail then heard the noise of a blow. Rosemary died of five gunshot wounds and a blunt injury to the head.

Gail drove to an alley near the Fields residence. Defendant removed the body from the car and left it in the alley while Gail covered the car's license plates. They drove to a car wash and cleaned the blood from the car. Debbie saw defendant and Gail return without Rosemary. When she heard police sirens, Debbie went to the alley and saw the body. She walked back to the house and asked defendant if the body was the girl who had been at the house. He laughed and said, "She was going on a long trip and was never coming back."

The prosecution introduced additional evidence to corroborate the testimony of Gail and Debbie. Clifton B. attested to the loan of the car, and said when it was returned it had two bullet holes in it. A prosecution witness described seeing a car in the alley which matched the description of B.'s car. Other witnesses described the discovery of Rosemary's body.

A bank official verified the $222 check from Rosemary to Gail Fields. Police officers who searched the Fields house discovered Rosemary's purse,

driver's license, and a torn check from Rosemary C. to Gail Fields for $185.

(b) *The robbery of Clarence G.*

Clarence G. testified that on the evening of October 2, 1978, he parked his Trans Am Pontiac outside a drug store. When he returned to the car, defendant and another man approached. Defendant was armed with a gun, and demanded the car keys. Clarence handed the keys to the other man and started to leave, but defendant called him back and asked for money. Clarence gave him what he had, about $4 or $5. The victims of defendant's subsequent crimes all observed defendant driving the Trans Am.

(c) *Crimes against Gwendolyn B. and Cynthia S.*

Gwendolyn B. and Cynthia S. were prostitutes. Early in the morning on October 5, 1978, they saw defendant and William ("Popeye") Blackwell, a 17-year-old friend of defendant, drive by in a Trans Am. Defendant and Blackwell, who had a gun, walked up to Gwendolyn and Cynthia, and ordered the two women into the car. As they entered the car, defendant asked if they had any money.

Defendant drove the car to an alley near the Fields residence. He took the gun from Blackwell and directed the women to enter the house and go to the upstairs bedrooms. Defendant ordered Gwendolyn to remove her clothes and took $50 she had hidden in her stockings. He inspected her for venereal disease, told her to do whatever his friend Blackwell wanted, then left the room. Blackwell then raped Gwendolyn. Defendant took Cynthia into another room, compelled her to disrobe, and took about $100 from her.

Later defendant, Blackwell, and the two women assembled in the same room and smoked marijuana. Defendant told Gwendolyn to have oral sex with Cynthia. After she complied, he then directed her to perform anal sex. Gwendolyn refused, and defendant struck her with the gun, breaking Gwendolyn's jaw and the handle of the gun. Defendant then raped Gwendolyn, while Blackwell raped Cynthia.

Gwendolyn passed out on a mattress in the bedroom. When she awoke on the blood-stained mattress, she saw Blackwell with a knife. Defendant told Blackwell, "Man, go and cut the bitch up. You can't just leave her laying there." Blackwell did not comply, and defendant then ordered Cynthia to clean up the blood from Gwendolyn's injury.

Defendant and Blackwell compelled the women to dress and accompany them in the Trans Am to pick up more prostitutes to rob. They found two

more women and defendant compelled them at gunpoint to get into the car.[1] After they returned to the Fields house, defendant permitted Gwendolyn and Cynthia to leave.

Cynthia took Gwendolyn to a hospital for treatment of the injury to her jaw. At the hospital, Gwendolyn used the name of Cynthia S. so she could use Cynthia's Medi-Cal card, while Cynthia used the alias of Nichole Williams.

The search of the Fields residence turned up Gwendolyn's wig and blouse and Cynthia's identification card. The police also observed extensive bloodstains on the mattress where Gwendolyn had lain.

(d) *Crimes against Colleen C.*

A few hours after releasing Gwendolyn and Cynthia, defendant and Blackwell found another victim.

Colleen C., an 18-year-old student at U.S.C., parked her car in a restaurant parking lot. Defendant and Blackwell, who was armed with a gun, approached and ordered her into a Trans Am parked in the alley near the restaurant. Blackwell drove to the Fields house.

Defendant took the gun from Blackwell and ordered Colleen to go into the bedroom. Blackwell asked for the keys to Colleen's car, and defendant demanded that she give them to Blackwell. When Blackwell left with the keys, defendant looked through Colleen's purse, took about $12, and asked if she had a checking account. Colleen said she did but it only contained $30.

Defendant ordered Colleen to remove her clothes, and struck her for not removing them fast enough. He then required her to perform oral sex on him and to submit to intercourse.

When the sexual acts were finished, defendant demanded more money. Colleen said she could withdraw $2,000 from a Crocker Bank savings account through a computerized night teller. She tore a page from the phonebook giving the address for local Crocker Bank branches, and she, defendant, and Blackwell drove to one of the branches. Defendant decided there were too many people around, and so returned to the Fields house without withdrawing the money.

---

[1]Defendant was not charged with this kidnaping. The victims' identities are not disclosed by the record; they did not testify at the trial.

Defendant rolled marijuana cigarettes and insisted that Colleen smoke them. He then told Colleen to call a girlfriend and ask her to bring money. She called her roommate, Cathy K., told Cathy her car had broken down, and asked Cathy to come to pick her up. Cathy and her brother drove to the address and honked, but because Cathy's brother was present defendant decided not to respond.

Defendant told Colleen that he would have to kill her because she had too many counts on him. Colleen begged him not to kill her. When Debbie M. knocked on the door, distracting defendant, Colleen tried to escape by throwing herself backwards through the closed window. She broke the window and cut her back, but defendant grabbed her and pulled her back into the house. Debbie M. calmed Colleen by putting the gun in another room, then left to get bandages for Colleen's back. Defendant then told Colleen that he would not kill her unless she tried to escape. He went to sleep; Colleen remained with him, awake, until morning.

In the morning defendant asked Colleen to prostitute for him. When she agreed, he said he would let her go if she would do him a favor. At defendant's request, she drove him to a location about four blocks away and purchased marijuana for him. Defendant gave Colleen back her car, watch, jewelry, and some of her clothes. She drove directly to her apartment and called her sister, who notified the police.

When the police arrived at the Fields house, defendant had left. He and Blackwell appeared later that day at Debbie's house, and stayed with her for two days. On October 9, 1978, defendant was arrested at the Greyhound bus station.

A police search of the stolen Trans Am revealed a torn page from the telephone book giving the Crocker Bank offices.[2] The book itself, minus the missing page, was found in the Fields residence. Defendant's mother appeared at the preliminary hearing wearing Colleen's blouse.

(e) *Defense testimony.*

Defendant himself did not testify. His counsel called a number of witnesses whose testimony cast some doubt on aspects of the prosecution testimony.

---

[2]The police discovered the gun used to threaten Gwendolyn, Cynthia and Colleen (and perhaps also used to kill Rosemary) in the glove box of a car driven by Lonnie Fields. The record does not indicate the relationship between Lonnie and defendant. The handle of the gun was broken, the result of the blow that broke Gwendolyn's jaw; Gwendolyn, Cynthia and Colleen all identified the weapon.

Cathy K., Colleen's roommate, testified that when Colleen phoned her from the Fields residence, Colleen said she was "loaded" and sounded intoxicated. Two officers who talked to Clarence G. said that victim told them that one of the persons who robbed him stuttered; so far as the record reveals, neither defendant nor Blackwell stutters. The officers who interviewed Gwendolyn and Cynthia testified to accounts which differed in some minor particulars from those witnesses' trial testimony. Gwendolyn also told both an officer and her boyfriend that she and Cynthia had smoked marijuana "dusted" with PCP.

(f) *Sanity phase testimony.*

Dr. Ronald Markman, a psychiatrist, testified for the defense that defendant had an "antisocial personality," a mental disorder previously referred to as psychopathology or sociopathology. Defendant was incapable of benefiting from experience, and lacked interest in conforming to social rules. Dr. Markman stated that in his opinion defendant, although capable of appreciating the criminality of his behavior, was unable to conform to legal requirements, and thus was insane under the test of insanity in effect at the time of the trial. (See *People* v. *Drew* (1978) 22 Cal.3d 333, 339 [149 Cal.Rptr. 275, 583 P.2d 1318].)

On cross-examination, Dr. Markman was asked, "[I]f the law were such that a mental disease or mental defect would not include an abnormality manifested only by repeated or otherwise antisocial conduct, Doctor, your opinion would be the defendant would be sane?" He replied, "[B]y definition what you are saying with that question is that you are excluding the antisocial personality. If you exclude the antisocial personality from the definition, sir, it certainly would change my conclusion."

The prosecution called two psychiatric witnesses, Dr. Donald Trockman and Dr. Saul Faerstein. Both agreed with Dr. Markman's diagnosis of "antisocial personality," but stated that in their opinion defendant was nevertheless capable of conforming to legal requirements.

(g) *Penalty phase testimony.*

The parties stipulated that defendant was convicted on December 28, 1976, of the voluntary manslaughter of Albert A. The investigating officer in that case testified as to defendant's confession, in which defendant admitted hitting Albert with a dumbell bar when Albert made a homosexual advance. The prosecution also introduced a photograph of Albert's body. Defendant presented no evidence at the penalty phase.

III. *Issues relating to selection of the jury.*

Defendant raises three issues relating to the voir dire and selection of the jury. He contends (1) that the exclusion of persons who said they would automatically vote against the death penalty in this case resulted in a guilt phase jury which was not a representative cross-section of the community; (2) that the court improperly limited his voir dire of jurors concerning capital punishment and improperly excluded at least one prospective juror because of his views on that subject; (3) that the prosecutor committed misconduct when he asked whether jurors believed that insanity "was the last refuge of the scoundrel" and that the court erred in not sustaining an objection to that question.

The first issue, the denial of a representative jury, affects both the guilt and sanity phases of this trial. The second issue bears primarily upon the penalty phase. The final jury selection issue relates principally to the sanity phase. Nevertheless, the jury selection issues are so closely related that we believe it would be most convenient to consider them as a group before turning to the issues arising at the trial itself.

(a) *Denial of a representative jury.*

Defendant claims that the exclusion for cause of persons opposed to capital punishment from the guilt phase of the trial violates his right to jury trial under the Sixth Amendment of the United States Constitution and article I, section 16, of the California Constitution. Recent cases have identified three related, yet analytically distinct, contentions which could be advanced in support of that claim. (*People* v. *Pacheco* (1981) 116 Cal.App.3d 617, 628 [172 Cal.Rptr. 269]; see generally *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].) First, a defendant could contend that the exclusion of jurors who would automatically vote against death but assert that they could be impartial on the question of guilt—a group we described in *Hovey* as the "guilt phase includables" (28 Cal.3d 1, 17, fn. 36)—results in a jury biased in favor of the prosecution. Second, a defendant could contend that the exclusion of this group impairs the purpose and function of a criminal jury. (See *Ballew* v. *Georgia* (1978) 435 U.S. 223 [55 L.Ed.2d 234, 98 S.Ct. 1029] (five-person jury unconstitutional.) Finally, he could contend that the exclusion abridges his right to a jury chosen from a representative cross-section of the community.

The first and second of these contentions require empirical proof of the effect of excluding the "guilt phase includables" upon the neutrality and performance of the jury. We considered the available evidence in *Hovey* v.

*Superior Court, supra,* 28 Cal.3d 1, and held it insufficient to demonstrate the unconstitutionality of the exclusion; defendant before us today does not challenge that holding. The petitioner in *Hovey,* however, did not raise the question of an unrepresentative jury, and neither *Hovey* nor any other ruling by this court since the 1977 restoration of the California death penalty has resolved this question.[3]

California courts applying earlier death penalty statutes did consider, but unanimously rejected, the contention that exclusion of the group in question violated constitutional guarantees. Before 1957, when the jury in a capital case in California decided both guilt and penalty in a single trial, a juror who could not be impartial on the penalty issue was necessarily excluded from the jury. (*People* v. *Riser* (1956) 47 Cal.2d 566, 575-576 [305 P.2d 1].) After the Legislature required a bifurcated trial, a number of cases considered whether this innovation should alter the holding of *Riser.* We concluded that even under the new procedure, exclusion of jurors opposed to capital punishment from the guilt trial did not deny the defendant a fair and impartial jury. (*People* v. *Gilbert* (1965) 63 Cal.2d 690, 711-712 [47 Cal.Rptr. 909, 408 P.2d 365]; *People* v. *Smith* (1966) 63 Cal.2d 779, 789 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Thomas* (1967) 65 Cal.2d 698, 706 [56 Cal.Rptr. 305, 423 P.2d 233]; *People* v. *Nicolaus* (1967) 65 Cal.2d 866, 882 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Gonzales* (1967) 66 Cal.2d 482, 498-499 [58 Cal.Rptr. 361, 426 P.2d 929].) The last of these decisions, *People* v. *Gonzales,* collected and set out the reasons advanced to justify excluding these jurors: that jurors opposed to capital punishment might not be impartial at the guilt phase of the trial; that the state had a valid interest in having a single jury try both guilt and penalty; and that the exclusion did not prejudice the defendant because jurors who favored capital punishment were also excluded.

---

[3]The Attorney General argues that we decided the cross-section jury issue in *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149] and *People* v. *Harris* (1981) 28 Cal.3d 935 [171 Cal.Rptr. 679, 623 P.2d 240]. He notes that in *Jackson,* we said that defendant contended "that exclusion of these jurors resulted in a jury adjudicating *guilt* which was *unrepresentative of the community* and unduly biased in favor of conviction. Identical contentions were raised and rejected very recently in *Hovey* v. *Superior Court* [citation omitted], and accordingly need not be reexamined here." (P. 313; all italics after "guilt" added.) Similarly, in *Harris* we said that "[d]efendant contends the exclusion of jurors opposed to capital punishment results in an *unrepresentative jury* on the issue of guilt and substantially increases the risk of conviction. This contention . . . lacks merit. (*Hovey* v. *Superior Court* [citation omitted].)" (P. 960; italics added.)

*Hovey,* the decision cited in both *Jackson* and *Harris,* rejected only the claim that a jury which excluded the "guilt phase includables" was biased in favor of guilt; it expressly avoided deciding the claim that such a jury violated the constitutional rule against exclusion of a cognizable group. (See 28 Cal.3d 1, 18, fn. 38.) The quoted language from *Jackson* and *Harris* refers to that holding, and was not intended to resolve the representative jury issue raised by defendant in the present case.

In 1968 the United States Supreme Court decided *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and added a new constitutional dimension to jury selection in capital cases. *Witherspoon* ruled that a state may exclude jurors for cause because of their views on capital punishment only if the jurors "made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" (Pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785].) By excluding not only that limited group, but also "all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle" (p. 520 [20 L.Ed.2d at p. 784]), Illinois produced "a jury uncommonly willing to condemn a man to die. . . . a tribunal organized to return a verdict of death." (P. 521 [20 L.Ed.2d at p. 784].) "No defendant can constitutionally be put to death at the hands of a tribunal so selected." (Pp. 522-523 [20 L.Ed.2d at p. 785].)

Witherspoon had been convicted, as well as sentenced, by a jury from whom all with doubts or scruples about capital punishment had been excluded. Yet the Supreme Court reversed only the penalty. With respect to guilt, it stated only that "[t]he data adduced by the petitioner . . . are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude . . . that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." (Pp. 517-518 [20 L.Ed.2d at p. 782].)[4]

By linking the question of an unrepresentative jury to the availability of empirical proof of a non-neutral jury, the *Witherspoon* opinion appears to overlook the argument that an unrepresentative jury is itself a violation of a constitutional right. Yet the court was not unaware of that issue, for Justice Douglas argued in a concurring opinion that the verdict of guilt should be reversed because Witherspoon was tried by an unrepresentative jury. (P. 531 [20 L.Ed.2d at p. 790].) Consequently, *Witherspoon*'s affirm-

---

[4]In a footnote the court added that "a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt.* If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view to its proper resolution." (P. 520, fn. 18 [20 L.Ed.2d at p. 784].)

ance of the guilt verdict in that case can be viewed as an implied holding that exclusion of persons opposed to capital punishment does not deny a defendant a representative jury at the guilt trial. (*Grigsby* v. *Mabry* (E.D. Ark. 1980) 483 F.Supp. 1372, 1385, modified (8th Cir. 1980) 637 F.2d 525.)

Following the *Witherspoon* decision, we reconsidered our prior decisions but concluded that "[A]ssuming that the jurors otherwise met the standards for exclusion for cause under *Witherspoon* they were properly excused despite their ability to fairly and impartially determine defendant's guilt." (*People* v. *Washington* (1969) 71 Cal.2d 1061, 1089-1090 [80 Cal.Rptr. 567, 458 P.2d 479].) Subsequent decisions adhered to this conclusion. In *People* v. *King* (1970) 1 Cal.3d 791, 804 [83 Cal.Rptr. 401, 463 P.2d 753], we held that exclusion of a juror whose opposition to capital punishment was founded upon religious belief did not infringe constitutional protection of the free exercise of religion. And in *People* v. *Thornton* (1974) 11 Cal.3d 738, 753-754 [114 Cal.Rptr. 467, 523 P.2d 267], we held that a defendant convicted under an unconstitutional death penalty statute was not entitled to a new guilt trial even though "guilt phase includable" jurors had been excluded from his jury.

*Thornton* was the last decision of this court to address the representative jury issue. The Courts of Appeal, however, have considered that issue on several occasions and consistently upheld the exclusion of the "guilt phase includables." (*People* v. *Henderson* (1978) 80 Cal.App.3d 584, 594-598 [145 Cal.Rptr. 751]; *People* v. *Sand* (1978) 81 Cal.App.3d 448, 452 [146 Cal.Rptr. 448]; *People* v. *Pacheco, supra,* 116 Cal.App.3d 617.) The decisions of other jurisdictions also conclude that exclusion of this group does not deny a defendant a representative jury. (See *Smith* v. *Balkcom* (5th Cir. 1981) 660 F.2d 573, 582-583; *Spinkellink* v. *Wainwright* (5th Cir. 1978) 578 F.2d 582, 595-597; *State* v. *Ortiz* (1975) 88 N.M. 370 [540 P.2d 850, 852-854]; *State* v. *Bayless* (1976) 48 Ohio St.2d 73 [2 Ohio Ops.3d 249, 357 N.E.2d 1035, 1046-1049].)

■ Defendant points out, however, that the United States Supreme Court has developed a new method for determining whether the exclusion of a group of jurors denies a defendant his right to a representative jury. The new format focuses, first, on whether the group in question constitutes a distinct and "cognizable" class and, if it so qualifies, on whether the state can show sufficient justification for excluding that class. No decision of this court, and no controlling precedent from the Supreme Court, has addressed the exclusion of "guilt phase includable" jurors under this analytic structure. Accordingly, despite the unanimous weight of precedent against de-

fendant's claim, we think it necessary to reappraise the validity of that exclusion in light of current constitutional doctrine.

We begin our analysis with *Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692], in which the court held unconstitutional a Louisiana statute which excluded women unless they volunteered for jury service. Justice White explained that "[t]he purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge. [Citation.] This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. . . . Restricting jury service to only special groups or excluding identifiable segments play- ing major roles in the community cannot be squared with the constitutional concept of jury trial." (P. 530 [42 L.Ed.2d at p. 698].)

Louisiana had argued that women and men do not vote as distinctive groups, and thus, that the exclusion of women from the jury would not affect its deliberation and verdict. Quoting *Ballard* v. *United States* (1946) 329 U.S. 187, 193-194 [91 L.Ed. 181, 186, 67 S.Ct. 261], the court replied that " 'the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both . . . a flavor, a distinct quality is lost . . . The exclusion of one may indeed make the jury less representative of the community than would be true if an economic or racial group were excluded.' " (Pp. 531-532 [42 L.Ed.2d at p. 699].)

Louisiana finally argued that excluding women served a rational purpose because women were more likely to qualify for child care exemption than men, and excusing all women was more convenient than making a juror by juror determination. The court responded that "[t]he right to a proper jury cannot be overcome on merely rational grounds. There must be weightier reasons if a distinctive class . . . is . . . to be excluded from jury service." (P. 534 [42 L.Ed.2d at p. 700].)

■■■ Four years later, in *Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664], the court held invalid a statute under which women were called for jury service, but automatically excused if they so requested. In reaching this result, the court set out a specific three-part test: "In order to establish a prima facie violation of the fair-cross section re- quirement, the defendant must show (1) that the group alleged to be ex- cluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and rea- sonable in relation to the number of such persons in the community; and

(3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (P. 364 [58 L.Ed.2d at pp. 586-587].) Once defendant sets out a prima facie case within these standards, the burden shifts to the state to show that "a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." (Pp. 367-368 [58 L.Ed.2d at p. 589].)

The principal difficulty in applying this test has been to determine whether the excluded persons constitute a "distinctive" group in the community. (Commentators and many lower court decisions, including those of this court, usually refer to such a distinctive group as a "cognizable class.") It is clear that groups defined by race, gender, or religion qualify. (See Winick, *Prosecutorial Peremptory Challenges in Capital Cases: An Empirical Study and a Constitutional Analysis* (1982) 81 Mich.L.Rev. 1, 67-68 and cases there cited.) Decisions are divided, however, on the cognizability of groups defined by age, occupation, economic status, and social status. (*Id.* at p. 68.)

The California Supreme Court considered the problem of defining a cognizable class in *Adams* v. *Superior Court* (1974) 12 Cal.3d 55 [115 Cal.Rptr. 247, 524 P.2d 375], decided one year before *Taylor* v. *Louisiana.* In *Adams,* a four-to-three decision upheld a statute limiting jury service to persons who have been residents of the state and county for at least one year. ▇ We stated that "before exclusion may be held improper, there must be a common thread running through the excluded group—a basic similarity of attitudes, ideas or experience among its members so that the exclusion prevents juries from reflecting a cross-section of the community." (P. 60.) "Measured by this standard," we said "the potential jurors here excluded do not constitute a cognizable class. The group's membership—cutting across economic, social, religious and geographical lines—changes day by day, creating a lack of real commonality of interest among the newly migrated." (*Id.*)

*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], presented a different issue—the use of peremptory challenges to exclude blacks, an admittedly cognizable group. In discussing that issue, however, we drew a distinction between challenges for group bias and challenges for specific bias, a distinction essentially parallel to that between cognizable and noncognizable groups.

In holding the use of peremptory challenges to exclude a cognizable group violated the California Constitution, we stated that "when a party presumes that certain jurors are biased merely because they are members of an iden-

tifiable group distinguished on racial, religious, ethnic, or similar grounds—we may call this 'group bias'—and peremptorily strikes all such persons for that reason alone, he not only upsets the demographic balance of the venire but frustrates the primary purpose of the representative cross-section requirement. That purpose, as we have seen, is to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences. Manifestly if jurors are struck simply because they may hold those very beliefs, such interaction becomes impossible and the jury will be dominated by the conscious or unconscious prejudices of the majority." (P. 276.)

We contrasted the proper use of peremptory challenge for specific bias, a bias "relating to the particular case on trial or the parties or witnesses thereto" (p. 276) and "essentially neutral with respect to the various groups represented on the venire." (*Id.*) The opinion offered several examples of challenges for specific bias: "both blacks and whites may have prior arrests, both rich and poor may have been crime victims, both young and old may have relatives on the police force, both men and women may believe strongly in law and order, and members of any group whatever may alienate a party by 'bare looks and gestures.'" (P. 276.) Implicit in this list of examples is that persons previously arrested, crime victims, believers in law and order, etc. are not identifiable groups whose representation is essential to a constitutional venire.

We returned to the question of defining a cognizable class in *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93 [154 Cal.Rptr. 734, 593 P.2d 595], which concerned disqualification of ex-felons and aliens. Justice Mosk wrote the dispositive opinion, joined by Justice Manuel; Justices Richardson and Clark concurred in the result. ■ The opinion by Justice Mosk states that "[t]wo requirements must . . . be met in order to qualify an asserted group as 'cognizable' for purposes of the representative cross-section rule. First, its members must share a common perspective arising from their life experience in the group, i.e., a perspective gained precisely *because* they are members of that group. It is not enough to find a characteristic possessed by some persons in the community but not by others; the characteristic must also impart to its possessors a common social or psychological outlook on human events." (P. 98.) Second, it states "[t]he party seeking to prove a violation of the representative cross-section rule must also show that no other members of the community are capable of adequately representing the perspective of the group assertedly excluded." (*Id.*)[5]

---

[5]The application of the second part of the *Rubio* test to the present controversy is unclear. On a penalty jury, it is obvious that the perspective of persons who would automatically

The opinion concluded that the excluded groups—ex-felons and aliens—failed the second part of this test and therefore were not cognizable groups.

The foregoing precedents do not resolve the issue before us, but they provide guidance in defining the concept of a cognizable class. It is clear that the groups recognized as cognizable classes are generally relatively large and well defined groups in the community whose members may, because of common background or experience, share a distinctive viewpoint on matters of current concern. Generally speaking, the courts have not recognized an otherwise heterogeneous group as cognizable merely because its members agree on one particular matter.[6] *Wheeler,* for example, suggested that persons who favor "law and order" are not a cognizable class (22 Cal.3d 258, 276); by the same token, opponents (or proponents) of capital punishment would not comprise a cognizable group.

Persons who would not be willing to vote for the death penalty come from diverse backgrounds and experiences, and may have diverse views on all other matters. Their unwillingness to vote for death may come from many sources: religious conviction, political alignment, moral philosophy, refusal to take such an awesome responsibility, or simply a feeling that "I just couldn't live with it." They do not comprise a distinctive, self-conscious group; one's identity is defined in part by his or her gender, race, religion, and other matters, but not generally by one's views on the single question of whether one would vote against death if chosen as a juror in a capital case. We conclude that the class of persons united only by their determination to vote automatically against the death penalty—a class divided in all else, including even their reasons for refusing to consider the death penalty—is not a cognizable class under the past appellate decisions defining that concept.[7]

---

vote against death would be inadequately represented by those who feel less strongly and might in some circumstances vote for death. But the question whether opponents of capital punishment bring a different perspective to the guilt trial is debatable. (The issue closely resembles the problem of proving that exclusion results in a biased jury which we discussed in *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1.) If that group does offer a different perspective on the issues at the guilt trial, then presumably excluding those members who take the strongest and most uncompromising view would dilute that perspective both in strength and proportional representation.

[6]The one exception is *Schowgurow* v. *State* (1965) 240 Md. 121 [213 A.2d 475], holding unconstitutional a Maryland practice of excluding atheists from juries. Although the court treated athiests as a cognizable class, the decision could also be justified on grounds of establishment of religion or of denial of equal protection.

[7]Defendant further argues that even if the "guilt phase includables" are not a cognizable group, their exclusion disproportionately excludes recognized cognizable groups. In *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1, 54-57, we observed that exclusion of opponents of capital punishment would exclude a higher percentage of women and blacks than of men and whites. An amicus brief from the American Friends Service Committee asserts that it would also exclude a high percentage of Quakers and other religious groups opposed to capital punishment. The affected groups—women, blacks, certain religious sects—are un-

Two recent federal district court decisions, *Grigsby* v. *Mabry* (E.D.Ark. 1983) 569 F.Supp. 1273, and *Keeten* v. *Garrison* (W.D.N.C. 1984) — F.Supp. —, have reached a contrary conclusion. Both decisions assume that a cognizable class does not require a common background and experience giving rise to a distinctive, self-conscious group, but requires only shared views and attitudes on related issues of social and legal policy—a position we reject. Both cases are subject to further appellate review, and we may look forward to a definitive ruling resolving this difficult controversy.

■ Our conclusion that the "guilt phase includables" are not a distinct, identifiable, cognizable class as that concept is defined in *Taylor, Duren,* and other controlling precedent does not dispose of defendant's claim that exclusion of this class abridges constitutional rights. One of the reasons for requiring a representative jury "is to achieve an overall impartiality by allowing the interaction of . . . diverse beliefs and values . . . ." (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 276.) The exclusion of members of a diverse, noncognizable group united only by their views on a particular issue will still exclude from the jury that particular viewpoint, and, to that extent, will necessarily diminish the representative character of the jury. ■ Moreover, the equal protection clauses of the United States and California Constitutions bar the arbitrary exclusion of any person or groups of persons from jury service, whether or not they comprise a cognizable class. ■ ■■■ (See *Rubio* v. *Superior Court, supra,* 24 Cal.3d 93, 101-105; *Adams* v. *Superior Court, supra,* 12 Cal.3d 55, 60-63.)[8]

■ In fact, persons who would automatically vote against the death penalty routinely serve on California noncapital cases, and all parties and

---

questionably cognizable groups under the controlling constitutional test.

With regard to women and blacks, defendant's contention fails for the same reason that the petitioner in *Hovey* failed to prove his case. California practice excludes not only those persons who would automatically vote against the death penalty, but also those who would automatically vote in favor of death for any person convicted of first degree murder with special circumstances. We know of no evidence that the net effect of excluding both automatic vote groups will be to significantly reduce the proportion of women and blacks on the jury.

With regard to religious groups, the issue is different, for the exclusion of one group could not be justified by excluding another sect with opposite views. Again, however, defendant has failed to provide any data to indicate which groups are opposed to capital punishment, what percentage of their members would always vote against the death penalty regardless of the evidence, and whether such members would be willing to vote impartially at the guilt phase knowing that their vote might be a crucial link in the chain of events leading to the defendant's execution.

[8]Defendant does not claim to be a member of the class of persons who would automatically vote against the death penalty. (See discussion in *Rubio* v. *Superior Court, supra,* 24 Cal.3d 93, 103.) He is, however, a member of the class of death penalty defendants, and therefore has standing to challenge a classification which distinguishes between such defendants and other defendants, compelling only the former to submit to trial before a jury that excludes the "guilt phase includables."

amicus alike assume that such persons could not constitutionally be excluded. The question before us, in terms of equal protection—and of the right to a representative jury, if that right can be asserted on behalf of a noncognizable group—is whether the state can justify excluding this group from the guilt phase of death penalty cases.

The state first asserts the long established legislative preference for a single jury qualified to try both phases of the trial (see *People* v. *Gonzales, supra,* 66 Cal.2d 482, 499), and notes the expense and inconvenience involved in any departure from this practice. If, for example, the penalty jury were not selected until after the first jury had found guilt and special circumstances, it would not have heard the guilt-phase evidence. Since the penalty jury must take into account "[t]he circumstances of the crime of which the defendant was convicted . . . and the existence of any special circumstance found to be true" (former Pen. Code, § 190.3, subd. (a)), the case would have to be retried in major part before the new jury. If, on the other hand, both juries were empaneled at the onset of the guilt trial, the state would incur the delay of double voir dire and the expense of maintaining two juries in all capital cases, even though many cases terminate before reaching the penalty phase.

Perhaps the most practical approach would be to select alternate jurors to replace the "guilt phase includables" at the commencement of the penalty phase. (See Winick, *op. cit. supra,* 81 Mich.L.Rev. 1, 57, fn. 194.) We held in *People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742], that if necessary an alternate juror could join the jury after deliberations had begun, but that the jury must be instructed to disregard all past deliberations and begin anew. (P. 694.) The proposal before us, however, envisions an alternate joining the jury after it had deliberated on the issues of guilt and special circumstances and reached a verdict. He would be joining a group which has already discussed and evaluated the circumstances of the crime, the capacity of the defendant, and other issues which bear both on guilt and on penalty. The resulting deliberations between old members who have already considered the evidence and may have arrived at tentative conclusions on some aspects of the case, and new members ignorant of those discussions and conclusions, would depart from the requirement that jurors "reach their consensus through deliberations which are the common experience of all of them." (*People* v. *Collins, supra,* 17 Cal.3d 687, 693.)[9]

---

[9]We recognize that unforeseen circumstances may require substitution of a juror at the penalty phase of a capital trial, even though the alternate did not take part in the guilt phase deliberations. (See *People* v. *Green* (1971) 15 Cal.App.3d 524, 528-529 [93 Cal.Rptr. 84].) But in view of the discussion in *People* v. *Collins, supra,* 17 Cal.3d 687, we should not adopt a policy which contemplates substitution of alternate jurors after the guilt trial as a routine procedure.

In this context, moreover, the preference for a single jury goes well beyond considerations of administrative convenience or expense and reflects a legitimate attempt to assure—insofar as possible—that the decision-making process of a death penalty case is a coherent whole. The preference for a single jury is by no means a one-sided matter; such a procedure may provide distinct benefits for both the prosecution and the defense. From the prosecution's point of view, the use of a single jury to determine both guilt and penalty may make it less likely that a juror's belief as to the inappropriateness of the death penalty will improperly skew the determination of guilt or innocence; as the drafters of the Model Penal Code's death penalty provision observed, "a juror's knowledge that he may not be in a position to control sentencing may induce him to hold out against conviction even when liability is plain." (1 Model Pen. Code, com. to § 210.6, pp. 146-147 (1980).) From defendant's perspective, the use of a single jury may help insure that the ultimate decision-maker in capital cases acts with full recognition of the gravity of its responsibility throughout both phases of the trial and will also guarantee that the penalty phase jury is aware of lingering doubts that may have survived the guilt phase deliberations. (Cf. 1 Model Pen. Code, § 210.6(1)(f) and com., pp. 107, 134 (1980) [death penalty should not be imposed when "although the evidence suffices to sustain the verdict, it does not foreclose all doubt respecting the defendant's guilt"].) Thus, there are a number of weighty considerations to support the statutory preference for a single jury in capital cases.

How should we describe these state interests? They certainly constitute a rational basis for the state's policy, which is all that is required under the equal protection clause. (See *Rubio* v. *Superior Court, supra,* 24 Cal.3d 93, 101; *Adams* v. *Superior Court, supra,* 12 Cal.3d 55, 62.) Arguably they constitute the "weightier reasons" (*Taylor* v. *Louisiana, supra,* 419 U.S. 522, 534 [42 L.Ed.2d 690, 700]), the "significant state interest" (*Duren* v. *Missouri, supra,* 439 U.S. 357), required in the representative jury cases. They would not, we are certain, justify a suspect classification excluding persons on grounds of race or gender. But the crucial fact in our opinion is that the interests advanced by the state—interests, let us say, of moderate weight and significance—nevertheless outweigh those interests asserted in favor of permitting the "guilt phase includables" to serve on the jury which tries guilt and special circumstance.

Defendant's right to a fair and impartial jury is not at issue here. We rejected the contention that the exclusion of the automatic vote groups from the guilt phase jury results in a prosecution prone jury in *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1, and defendant disclaims any intention to reassert that contention. He does not claim that he was in fact prejudiced by the jury selection procedure—that a more representative jury would likely have

reached a different result. On the record before us, it is unlikely that any unbiased jury would fail to find defendant guilty of a premeditated murder committed during the commission of a robbery.

All that defendant can claim is that the jury was deprived of an elusive but "distinct quality" or "flavor" (*Taylor* v. *Louisiana, supra,* 419 U.S. 522, 531 [42 L.Ed.2d 690, 698-699]) by the exclusion of the "guilt phase includables," which in some uncertain and undefinable way might have affected the jury's deliberations. His interest in this "quality" or "flavor" is constitutionally cognizable under *Taylor,* but it is not a very substantial interest.

The interest of the excluded group is of no greater weight. Opponents of capital punishment are not traditional victims of discrimination. Their exclusion from capital juries is not a badge of servitude or an assertion of inferiority (compare *Carter* v. *Jury Commission* (1970) 396 U.S. 320 [24 L.Ed.2d 549, 90 S.Ct. 518], [Blacks]), nor a perpetuation of obsolete stereotypes (compare *Duren* v. *Missouri, supra,* 439 U.S. 357 [women]). Service on a capital jury is not a sought-after position, but an onerous obligation, and so long as exclusion denotes no stigma of inferiority, few persons would complain.

In sum, we conclude that the group of persons who would automatically vote against death at the penalty phase, yet profess impartiality at the guilt phase—the "guilt phase includables"—are not a cognizable group, the exclusion of which makes a jury unrepresentative and unconstitutional. The interest of the state in maintaining a unitary jury for both phases of the trial is sufficient to justify the exclusion of this noncognizable group.

(b) *Limitation of voir dire of prospective jurors, and exclusion of jurors.*

The Supreme Court decision in *Witherspoon* v. *Illinois, supra,* 391 U.S. 522 held that a court may not exclude jurors for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (P. 522 [20 L.Ed.2d at p. 785].) The only jurors who may be dismissed are those "who make it unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them." (*Id.,* at fn. 21 [20 L.Ed.2d at p. 785].) Relying on this holding, defendant maintains that the trial court improperly limited his voir dire of juror Harris and subsequent jurors, preventing him from showing that the jurors should not have been dismissed; and that the dismissal of juror Rumbo violated the *Witherspoon* test. As we shall explain, both the court's order limiting the voir dire of Harris and its

exclusion of Rumbo present the same issue: whether the court may dismiss for cause a juror who will automatically vote against death *in the case before him,* but might consider the death penalty in other cases.

The trial judge asked Mrs. Harris and most of the other jurors a series of standard questions concerning their views on capital punishment. Question number three, the first question relating to the penalty phase, was: "Regardless of whatever evidence might be presented at the penalty phase of the trial, should we get that far along, will you automatically and absolutely refuse to vote for the death penalty or a verdict of death *in the case involving these charges and special circumstances?*" Mrs. Harris responded unequivocally, asserting that she would automatically vote against the death penalty in a case "involving these charges and special circumstances," and adhered to that position on further questioning.

Counsel, however, asked Mrs. Harris: "Are you saying that it is this particular case that you would not follow the law?" She replied, "Yes." Counsel then inquired: "*So that it is not an all-encompassing refusal to follow the law as it relates to the death penalty, but only in this particular case?*" She again replied, "Yes."[10]

At this point, juror Harris had made clear that she was absolutely opposed to the death penalty in this case, but not necessarily in every case. Counsel attempted to illustrate the point through an example: "If Adolf Hitler were on trial charged with murdering six million people . . . ." The court refused to permit the question, saying that "I don't think it is fair to ask a juror to speculate what they might do with Adolf Hitler. We are concerned with a particular case before this court, and I think the inquiry should be restricted to following the law, [and] any conscientious objections in this case here today." It then granted the prosecutor's motion to dismiss juror Harris.[11]

---

[10]Mrs. Harris was not asked to explain her distinction between the present case and other capital cases. Her view rejecting capital punishment in the present case, but not in all cases, would make sense if she believed that penalty appropriate only in a case involving some special circumstance, such as multiple murder or murder by torture, not charged in this case.

[11]The trial court posed the same standard question, with its emphasis on the charges and special circumstances in the particular case at hand, to most of the other jurors. Nine jurors who affirmed that they would automatically vote against the death penalty in this case were dismissed for cause. In each instance defense counsel sought to rehabilitate the juror by showing that he would consider the death penalty in a case involving Hitler or some other hypothetical defendant; the court consistently refused to permit counsel to do so. Thus the issue discussed with respect to Mrs. Harris arises also with respect to these other jurors.

We do not endorse the trial court's standard question. By departing from the language of *Witherspoon,* and emphasizing the charges and special circumstances of the particular case at hand, the court risked misunderstanding and reversible error.

Juror Rumbo's initial answers were less definite than Mrs. Harris'. To the court's standard question—whether he would automatically refuse to vote for the death penalty—he replied, "I probably would, Your Honor. It would be very difficult for me to vote for the death penalty. Almost impossible, sorry."

The voir dire continued:

"THE COURT: Do you feel that your mind is open to consider that possibility . . . and deliberate with your fellow jurors . . . ?

"JUROR RUMBO: I could deliberate it and so forth. But casting that ballot I don't think I could do it. . . . [¶] . . . I can do as I am told up to that point, Your Honor. I would try. But I know I would let you down."

The court explained that it was not a matter of letting anyone down, but of taking the responsibility for making the penalty decision. Rumbo answered, "I can't take that responsibility to that extent. I don't want to. That is putting me in an awful position."

The trial judge and the prosecutor then attempted to obtain unequivocal answers. The judge asked Rumbo, "Can you set aside personal views and render your decision based on the evidence and the instructions of law?" Rumbo replied, "No." The prosecutor asked, "Are you of such a mind, sir, that you would never vote to impose the death penalty under any circumstances *in this case*?" Rumbo replied, "Yes." The court then excused the juror for cause.

Rumbo's initial answers—that he "probably" would automatically vote against the death penalty; that it would be "very difficult" for him to vote for death—are clearly insufficient to permit his disqualification under *Witherspoon*. (*People* v. *Risenhoover* (1968) 70 Cal.2d 39, 55-56 [73 Cal.Rptr. 533, 447 P.2d 925]; *People* v. *Vaughn* (1969) 71 Cal.2d 406, 412-413 [78 Cal.Rptr. 186, 455 P.2d 122]; *People* v. *Velasquez* (1980) 26 Cal.3d 425, 440 [162 Cal.Rptr. 306, 606 P.2d 341].) *Witherspoon* permits disqualification only if the juror makes his position "unmistakably clear" (391 U.S. at p. 523, fn. 21 [20 L.Ed.2d at p. 785]); uncertain, hedged, or ambiguous responses do not meet that test. (See *People* v. *Lanphear* (1980) 26 Cal.3d 814, 841 [163 Cal.Rptr. 601, 608 P.2d 689] and cases there cited.)

On subsequent questioning, however, Rumbo stated unequivocally that he would not follow the law at the penalty phase and that he would automatically vote against the death penalty in the case before him. The People rely upon those answers to justify his exclusion.

We faced a similar issue in *People* v. *Floyd* (1970) 1 Cal.3d 694 [83 Cal.Rptr. 608, 464 P.2d 64]. Juror Rogers in *Floyd* at first stated that the death penalty was a question of "degree" on which she would "have to get all the facts," but later replied "no" to the question whether she would have the courage to vote for death in a proper case. We upheld her exclusion on two grounds. First, we relied on the rule that "'[w]here a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court.'" (1 Cal.3d at p. 725, quoting *People* v. *Linden* (1959) 52 Cal.2d 1, 22 [338 P.2d 397].) Alternatively, we concluded that "Miss Rogers made it unmistakably clear that under no circumstances would she impose the death penalty." (P. 725.) Applying the analysis in *Floyd,* we conclude that the trial court in the present case could properly determine that Rumbo's later, unequivocal answers correctly stated the juror's views. In answer to the prosecutor's question, Rumbo had clearly and unmistakably affirmed that he would never vote to impose the death penalty *in this case*. If that answer is sufficient to permit exclusion under *Witherspoon,* then the trial court did not err in dismissing Rumbo.

 The exclusion of Rumbo thus raises the question whether the dismissal of a juror who would automatically vote against the death penalty in the case at hand, but not necessarily in some other case, violates *Witherspoon*. The court's ruling limiting the voir dire of juror Harris and subsequent jurors raised the identical issue.

The United States Supreme Court has not decided whether a juror who affirms only that he would automatically vote against death in the case before him can be excluded for cause. Language in both *Witherspoon* and *Adams* v. *Texas* (1980) 448 U.S. 38 [65 L.Ed.2d 581, 100 S.Ct. 2521], however, suggests that exclusion of such a juror violates no constitutional constraints.

In *Witherspoon,* the court noted that jurors "cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) The implication of this language is that a juror who is not willing to consider

the death penalty in the case before him, but is irrevocably committed before trial to vote against that penalty, can be excluded for cause.

In *Adams* v. *Texas, supra,* 448 U.S. 38, the Supreme Court reviewed the *Witherspoon* decision and later cases following that precedent. The *Witherspoon* test, the court stated, "seems clearly designed to accommodate the State's legitimate interest in obtaining jurors who could follow their instructions and obey their oaths." (P. 44 [65 L.Ed.2d at p. 589].) Thus, under *Witherspoon* and subsequent cases, "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." (P. 45 [65 L.Ed.2d at p. 589].)

The jurors at issue here were called to decide a case arising under the 1977 death penalty statute. The Legislature had determined that death was a possible punishment for premeditated murder during the commission of robbery, and required the jury in deciding the question to "consider, take into account, and be guided by" listed aggravating and mitigating facts. A juror who resolved in advance not to impose the death penalty in the case before him, whatever his views might be in other cases, could not "conscientiously apply the law as charged by the court" (*Adams* v. *Texas, supra,* 448 U.S. 38, 45 [65 L.Ed.2d 581, 589]) because he had already determined the penalty without considering the relevant aggravating and mitigating factors. It follows that such a juror may be dismissed for cause without violating the constitutional doctrine expounded in *Witherspoon* and *Adams.*[12]

We therefore conclude that a court may properly prohibit voir dire which seeks to ascertain a juror's views on the death penalty in actual or hypothetical cases not before him. We also conclude that a court may properly excuse a prospective juror who would automatically vote against the death

---

[12]The California decisions following *Witherspoon* have not discussed that doctrine in terms of the juror's ability to follow his oath and carry out the instructions of the court. We have, however, expressed our disapproval of the use of hypothetical cases to test a juror's views on capital punishment. (See *People* v. *Velasquez, supra,* 26 Cal.3d 425, 440, fn. 11; *People* v. *Vaughn, supra,* 71 Cal.2d 406, 413; *People* v. *O'Brien* (1969) 71 Cal.2d 394, 404-405 [79 Cal.Rptr. 313, 456 P.2d 969]; *People* v. *Risenhoover, supra,* 70 Cal.2d 39, 55-56.) The tenor of those decisions is that a juror's view of other cases is largely irrelevant to the *Witherspoon* standard because such views would not make it unmistakably clear whether the juror would automatically vote against death in the case to be tried. Thus, the California cases support the trial judge's ruling in the present case barring defense counsel from questioning the jurors about extreme or hypothetical cases.

penalty in the case before him, regardless of his willingness to consider the death penalty in other cases.[13]

(c) *Voir dire of a juror concerning the insanity defense.*

In questioning juror Tuey, the prosecutor asked her if she believed a person charged with committing a crime such as defendant's must be insane. She replied, "No." He then asked, "On the other hand, do you feel that the defense of insanity is the last refuge of a scoundrel?"

Defendant objected, and the court, commenting that "it is colorful language," asked the prosecutor to reframe the question. He did so, asking the juror whether "to use less colorful language, do you feel there could be such a thing as a person who is legally insane?" The juror responded that "There could be."

■■■ The scope of the question was proper, since the juror's views on the insanity defense was a suitable subject for voir dire. In *People* v. *Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869], however, we observed that although the court "cannot exclude questions proper in scope, it is free to require that they be phrased in neutral, nonargumentative form." (P. 408.) Thus the court correctly required the prosecutor to rephrase the question to the juror.

■■■ Defendant contends that the asking of the question by the prosecutor was misconduct, designed to prejudice the jurors against the insanity defense. But whether or not it was misconduct, we do not believe defendant was prejudiced by the question. The issue relates to a single question asked

---

[13]When the court excludes a juror on this ground, however, it must take care to avoid violation of *Witherspoon*'s command that a juror can be dismissed for cause only if he would vote against capital punishment "without regard to any evidence that might be developed at the trial of the case . . . ." (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) If a prospective juror has been informed of the evidence to be presented, his asserted automatic vote may be based upon this information, in which case exclusion of the juror because of his views on the death penalty would violate *Witherspoon.* For example, a juror who announces that he would automatically vote against death in the case before him because he has been told (whether true or not) that the prosecution case rests entirely on circumstantial evidence is not casting a vote without regard to the evidence, and cannot be excluded under the *Witherspoon* formula.

In the present case, each of the excluded jurors unequivocally asserted that he would automatically vote against the death penalty in the case before him regardless of the evidence. None even hinted that his vote was based upon a preconception of the evidence. With the exception of juror Harris, none suggested that his opposition to the death penalty was limited to this specific case, and Harris knew nothing of the evidence in this case except what she could infer from the charges and special circumstances. On this record, we can only conclude that each excluded juror would have cast an automatic vote against the death penalty regardless of the evidence, and thus were properly excluded for cause.

of only one juror. The court directed the prosecutor to reframe the question, and he did so. The juror involved did not serve on the jury. To find prejudice, we would have to conjecture that other members of the panel who did serve paid attention to the voir dire of Ms. Tuey, that hearing this question led them to wonder whether the insanity defense was merely "the last refuge of a scoundrel," and that such reasoning led them to reject defendant's insanity evidence. This train of causation is entirely too speculative to support a finding of prejudice under the *Watson* test (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]), which requires a showing that it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (P. 836.)

IV. *Guilt phase and special circumstances issues.*

(a) *The plea bargain and testimony of Gail Fields.*

Gail Fields, defendant's sister, entered into a plea bargain under which she agreed to testify as a witness for the People in the present case. The district attorney in return agreed to permit her to plead guilty to being an accessory to murder and to recommend that she serve no additional time beyond the date of sentencing. Gail was informed that the judge reserved the right to nullify the bargain if, after hearing the entire evidence, he concluded that it was unfair.

In the present trial, Gail Fields disclosed the plea bargain on direct examination. On cross-examination the following dialogue occurred:

"Q. Now, it was part of the deal that you would testify in here today according to the statement that you gave the court reporter last night in the lockup?

"A. Yes.

"Q. Is it your understanding that if you took the stand this morning and you told the story different this morning from what you told them yesterday that the deal would fall through?

"A. If I told a different story, that it would—

"Q. There'd be no more deal.

"A. Yeah.

"Q. And you understand that what they expected you to testify to is what you told them back in the back yesterday in order to get a deal; isn't that right?

"A. Yes."

On redirect examination the prosecutor returned to the witness' understanding of the plea bargain:

"Q. The final statement you gave Investigator Mattingly, was that the truth?

"A. Yes.

"Q. I asked you today to testify to the truth, did I not?

"A. Yes.

"Q. I never said, 'Testify to a certain story,' did I?

"A. No."

 Defendant contends that the testimony of Gail Fields should have been excluded, citing *People v. Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133]. In *Medina,* three witnesses testified under a grant of immunity "'subject to the conditions that the witness not materially or substantially change her testimony from her tape-recorded statement already given to the law enforcement officers . . . .'" (P. 450.) The court acknowledged that a grant of immunity could be conditioned on a requirement that the witness testify fully and fairly to the facts, but held that when the terms of the immunity place the witness "under a strong compulsion to testify in a particular fashion" (p. 455), the testimony is tainted and inadmissible.

We do not believe the *Medina* rule is applicable to the present case. The record of the plea of Gail Fields discloses that the specific bargain, as put to her and accepted by her, was "to testify as a witness on the part of the People of the State of California as to the truth of those events that occurred on September 28, 1978." Defense counsel claims Gail's testimony recounting that bargain was inconsistent: in response to his questions she said she agreed to testify in accord with her last statement to the police, but in response to the district attorney's questions she said she agreed only to tell the truth. Contrary to defendant's contention, however, Gail's trial testimony is not necessarily inconsistent; if the last statement she gave the police was the truth, then by agreeing to testify truthfully she has in fact agreed

to testify in accord with that statement. Moreover, even if we were to view her testimony as inconsistent, the inconsistency arises not from her own words, but from her failure to dispute leading questions as put by counsel for both sides. The testimony is not sufficient to demonstrate either that the plea bargain required Gail Fields to testify in accord with her statement regardless of its truth, or that Gail so understood the agreement.

We recognize that a witness in Gail Fields' position is under some compulsion to testify in accord with statements given to the police or the prosecution. The district attorney in the present case obviously believed that Gail's last statement was a truthful account, and if she deviated materially from it he might take the position that she had breached the bargain, and could be prosecuted as a principal to murder. But despite this element of compulsion, it is clear, and the cases so hold (see, e.g., *People* v. *Dixon* (1979) 24 Cal.3d 43, 53 [154 Cal.Rptr. 236, 592 P.2d 752]) that an agreement which requires only that the witness testify fully and truthfully is valid, and indeed such a requirement would seem necessary to prevent the witness from sabotaging the bargain. We believe the requirements of due process, as explained in *Medina,* are met if the agreement thus permits the witness to testify freely at trial and to respond to any claim that he breached the agreement by showing that the testimony he gave was a full and truthful account.

(b) *Improper closing argument.*

Defendant contends that the prosecutor committed misconduct by appealing to the jury's sympathy for the victim in his closing argument, and that the trial court erred in overruling his objection to that presentation. We quote the relevant passages from the reporter's transcript:

"[DISTRICT ATTORNEY]: Now, think of yourself as Rosemary [C.] A young librarian from the University of Southern California; a quiet girl, not outgoing. You haven't been seen with a boyfriend. You take the bus to work. You are either a virgin, or you have had very minimal sexual activity in your lifetime. . . .

"It is now the late evening of September 27th, early morning hours of September 28th. You find yourself in the defendant's residence at 2706 South La Salle in Los Angeles.

". . . [T]he defendant demands that you write him out a check payable to his sister, Gail Fields. The defendant threatens to kill you unless you give him the money. You are now naked and tied to the bed rails of the defendant's bed. You are forced to write several checks. The defendant

looks at your checkbook and figures out certain amounts of money on paper. You finally write out a check to Gail Fields for $222.81."

The district attorney continued to describe the murder from the victim's perspective:

"The defendant directs Gail to drive onto the Santa Monica Freeway, and all of a sudden the defendant shoots you on the side and you yell, 'Oh, God.' You hear Gail beg the defendant not to shoot you again, and the defendant shoots you again."

Finally, defense counsel objected, but the court overruled the objection. The district attorney continued his narrative:

"Do you wonder about heaven, about God? You know there is no escape. The defendant shoots you more times. He states that you are not dead, and he has to make sure you are dead, and he hits you with an object on your head leaving triangular marks, probably the gun. And there are now four lacerations on your head. And it takes 10 or 15 minutes for you to die. Blood meanwhile spatters on your face.

"For this the defendant is charged with the murder and the robbery of Rosemary [C.]"

■■■ In our opinion, the district attorney's argument was improper, and defendant's objection should have been sustained. The prosecutor invited the jury to depart from their duty to view the evidence objectively, and instead to view the case through the eyes of the victim. His argument was an appeal to the jurors to permit sympathy for the victim to influence their verdict.

■■■ It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial.[14] (See *People* v. *Carlin* (1968) 261 Cal.App.2d 30 [67 Cal.Rptr. 557]; *People* v. *Leach* (1934) 137 Cal.App. 753 [31 P.2d 449]; *People* v. *Botkin* (1908) 9 Cal.App. 244 [98 P. 861]; CALJIC No. 1.00.) ■■■ We recognize that

---

[14]Appeals to sympathy may be proper at the penalty phase of the trial. In *People* v. *Haskett* (1982) 30 Cal.3d 841 [180 Cal.Rptr. 640, 640 P.2d 776], the prosecutor in his penalty phase argument invited the jurors to "put themselves in the shoes of Mrs. Rose [the victim] and imagine suffering the acts inflicted on her." (P. 863.) We said that "[a]lthough appeals to the sympathy or passions of the jury are inappropriate at the guilt phase [citation], at the penalty phase the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience." (*Id.*)

the prosecutor "may vigorously argue his case and is not limited to 'Chesterfieldian politeness'" (*People* v. *Bandhauer* (1967) 66 Cal.2d 524, 529 [426 P.2d 900]; see *People* v. *Ross* (1960) 178 Cal.App.2d 801, 808 [3 Cal.Rptr. 170]), but the bounds of vigorous argument do not permit appeals to sympathy or passion such as that presented here.

We conclude, however, that the misconduct of the prosecutor and the erroneous ruling of the trial judge did not prejudice defendant. The evidence of defendant's guilt of first degree murder was overwhelming: the eyewitness testimony of Gail Fields; the statements of defendant to Debbie M.; an array of circumstantial evidence. We find no reasonable probability that the prosecutor's appeal to the jurors' sympathy for the victim affected the verdict rendered. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

(c) *Jury instructions and evidence on felony murder.*

Former Penal Code section 190.2 provided that a defendant found guilty of first degree murder may be sentenced to death if he "was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such act or acts causing death and any of the following additional circumstances exists: [¶] (3) The murder was willful, deliberate, and premeditated and was committed *during the commission* or attempted commission *of* any of the following crimes: [¶] (i) *Robbery,* in violation of Section 211 . . . ." (Italics added.)

In *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], 61, we explained the basis of the felony murder special circumstance under the 1977 law. "At the very least," we said, "the Legislature must have intended that each special circumstance provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not. The Legislature declared that such a distinction could be drawn, inter alia, when the defendant committed a 'willful, deliberate and premeditated' murder 'during the commission' of a robbery or other listed felony. [Citation.] The provision thus expressed a legislative belief that it was not unconstitutionally arbitrary to expose to the death penalty those defendants who killed in cold blood in order to advance an independent felonious purpose . . . ."

 In other words, while either premeditation or a killing during the commission of a felony will raise the crime to first degree murder, neither standing alone rendered a defendant liable to the death penalty. Both elements were essential to a felony murder special circumstance. By this requirement, the 1977 death penalty law limited the number of those persons

who would face special circumstance proceedings and avoided arbitrary infliction of the death penalty upon defendants of lesser culpability.

The jury in the present case, instructed on both premeditated and felony murder, found defendant guilty of the first degree murder of Rosemary C. It also found him guilty of robbery of Rosemary. Finally, it found true the special circumstance allegation of premeditated murder "during the commission of a robbery." Defendant contends that no substantial evidence supports this finding, and that the jury was improperly instructed on this subject.

We briefly recapitulate the undisputed evidence bearing on the felony murder issue. Defendant robbed Rosemary C. by compelling her to write a check to Gail Fields, who cashed the check and turned over most of the money to defendant. Several hours later defendant, Gail, and the victim entered a car. While Gail drove, defendant shot and struck Rosemary, killing her. He then dumped the body in an alley near his house. The testimony suggests two possible motives for the killing: (1) revenge because Rosemary tried to frustrate the robbery—in defendant's words, to "run a game" on him—by writing a check for less than the maximum possible; or (2) to eliminate her as a witness against him.

After hearing this evidence, the court instructed the jury that: "A robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrator is in hot flight, that is, while in possession of the stolen property he is fleeing in an attempt to escape. . . . [¶] A robbery is complete when the perpetrator . . . has reached a place of temporary safety and is in unchallenged possession of the stolen property after having effected an escape with such property." (CALJIC No. 9.15 as modified by the court.)

As defendant observes, this instruction, even as modified by the court, was ill-adapted to assist the jury in determining whether defendant murdered Rosemary C. "during the commission" of a robbery. In deciding that question, the jury could properly consider that defendant might not have reached a place of temporary safety or attained unchallenged possession of the stolen property when he was still encumbered with Rosemary, a victim who at first opportunity might call the police. But it is clear that defendant was not in "hot flight, fleeing with the stolen property."

The unnecessary and inappropriate reference to "hot flight" in the jury instruction, however, could not have prejudiced defendant. Had this instruction misled the jurors to believe that "hot flight" was essential to a finding that the murder occurred in the commission of a robbery, defendant would

have gained a benefit to which he was not entitled. The case in this respect is analogous to *People* v. *Salas* (1972) 7 Cal.3d 812, 824 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832], in which we said that "[a]lthough the introduction in the instructions to the jury of concepts of immediate pursuit together with scrambling possession . . . may have been erroneous, no prejudice resulted to defendant *as in any event the jurors were compelled to find that the homicide was committed before defendant had reached a place of safety.* The introduction of the pursuit and scrambling concepts did in fact confer benefits to which defendant was not entitled." (Italics added.)

 We turn therefore to the question whether substantial evidence supports the jury's finding that Rosemary C. was murdered "during the commission of the robbery."[15] A sizable body of California decisions has discussed the duration of the crime of robbery and the relationship of that crime to some other offense which occurs after the exact moment when the property changed hands. Although some of these cases arise under statutes whose wording differs from the statute at issue here, they address a problem common to this case—whether the relationship between a robbery and another crime is sufficiently close to justify an enhanced punishment. We therefore look to these cases for guidance in our analysis of the felony murder issue in the present case.

In *People* v. *Carroll* (1970) 1 Cal.3d 581 [83 Cal.Rptr. 176, 463 P.2d 400], defendant robbed Gulsvig in a restroom, pursued him into a bar and shot him. He was convicted of inflicting great bodily injury on Gulsvig "in the course of the commission of the robbery." (Former Pen. Code, § 213.) We said that "[t]he fact that defendant was not engaged in the asportation of any loot at the time he shot Gulsvig is immaterial. He became angry after discovering no money in the wallet and having the rest room door slammed in his face. His purpose in running into the bar appears to have been to exact his revenge from Gulsvig. Under the circumstances, the robbery and shooting of Gulsvig constituted one indivisible transaction . . . ." (Pp. 584-585.)

---

[15]The Attorney General emphasizes the evidence that Rosemary took her purse with her when she went with defendant and Gail, and that the purse was later discovered in the Fields house. He argues that the robbery of the purse, contemporaneous with the murder, alone is sufficient to support the special circumstance finding.

In *People* v. *Green, supra,* 27 Cal.3d 1, 60-61, we explained that a robbery which is merely incidental to a murder will not support a felony murder special circumstance finding. Whenever a defendant kills a clothed victim and takes possession of the body to dispose of it, he acquires possession of the victim's clothes and any personal effects the victim may have been carrying. Unless, however, the killer has an independent felonious purpose to acquire those items, this possession, wholly incidental to the killing, will not support a felony-murder finding. In the present case, we find no evidence that defendant killed Rosemary with the independent felonious purpose of robbing her of her purse.

In *People* v. *Laursen* (1972) 8 Cal.3d 192 [104 Cal.Rptr. 425, 501 P.2d 1145], fleeing robbers kidnaped a motorist and compelled him to drive them from the scene of the robbery. We held defendant could be found guilty of kidnaping "to commit robbery" (Pen. Code, § 209); "[t]he assault of the victim, the seizure of his property and the robber's escape to a location of temporary safety are all phases in the commission of the crime of robbery linked not only by a proximity of time and distance, but a single-mindedness of the culprit's purpose as well." (Pp. 199-200.)

In *People* v. *Green, supra,* 27 Cal.3d 1, when we explained the basis for the felony murder special circumstance, we illustrated that special circumstance by describing a killing resembling the present case, e.g., a murder by a defendant "who carried out an execution-style slaying of the victim of or witness to a holdup, a kidnaping, or a rape." (P. 61.)

Finally, in the recent case of *People* v. *Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908], defendant and his partner compelled two workers at a restaurant to go into the walk-in refrigerator. When the robbers had finished taking money from the safe, defendant reentered the refrigerator and shot both workers, killing one of them. We upheld the jury's finding that the murder occurred during the commission of the robbery under section 190.2, stating that "[i]n the instant case, the killing occurred at the same location as the robbery and within a short time after the money was taken from the safe. Moreover, the jury could well have concluded that the purpose of the killing was to eliminate a witness to the robbery." (P. 587.)

Two decisions of the Court of Appeal present an even closer analogy to the present case. The first, *People* v. *Powell* (1974) 40 Cal.App.3d 107 [115 Cal.Rptr. 109], was described in the book The Onion Field. Defendants in *Powell* kidnaped two police officers in Los Angeles, took their guns and money, and drove them to Kern County where defendant Powell shot and killed one officer. The court held the felony-murder rule (based on the robbery of the guns and money) applicable because as long as the defendants were accompanied by and saddled with the officers they had not reached a place of temporary safety. (P. 164.)

The second case is *People* v. *Sirignano* (1974) 42 Cal.App.3d 794 [117 Cal.Rptr. 131]. Defendant lured the victim to a hotel room, struck him, and robbed him. "Long after it was apparent that no additional money would be forthcoming from the victim, the persons involved, including defendant, continued to assault him; when he was dead, the group took steps to avoid apprehension for the robbery and death." (P. 801.) Defendant contended that the robbery was completed before the killing, and that she had reached a place of temporary safety. The court, noting the inference that defendant

planned to kill the victim so he would not be able to testify, held that "[t]here was substantial evidence to support the conclusion that the events of the evening formed one 'continuous transaction,' and such a finding clearly results in felony-murder, in the first degree." (P. 802.)[16]

Defendant, on the other hand, calls our attention to *People* v. *Ford* (1966) 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132], but we find that decision distinguishable.[17] Explaining why we could not uphold a conviction of first degree murder under the felony-murder rule, we said that "[i]n the present case . . ., many hours elapsed between the time of the robbery and the shooting of Officer Stahl. [T]here was here no direct evidence that defendant was endeavoring to escape the robbery when he shot the deputy; on the contrary, there is strong evidence that he was not. . . . Additionally, it should be pointed out that defendant had the opportunity to and did spend some of his loot prior to the shooting; that during the period of approximately four hours between the robbery and the killing he drove aimlessly over a great distance; and that, with respect at least to the robbery, he had won his way to places of temporary safety before he committed the homicide. Considering the facts as a whole, it must be held that the robbery and escape therefrom did not motivate defendant's subsequent conduct, but were merely incidental to his primary objectives. Thus, it cannot be held that the homicide can be promoted to murder of the first degree on the theory that the homicide was committed in the perpetration of a robbery." (Pp. 56-57.)

On the basis of the cases discussed, we conclude that the jury finding of special circumstances in the present case should be sustained. We recognize that when Gail Fields returned with the proceeds of Rosemary's check and gave them to defendant, he had control of the robbery proceeds in his own residence. That residence, however, was not a place of safety so long as Rosemary was held prisoner. (See *People* v. *Powell, supra,* 40 Cal.App.3d 107.) In an unguarded moment, she might escape, notify the police, and render the Fields residence quite unsafe for defendant. In order

---

[16]We note also *People* v. *Manson* (1976) 61 Cal.App.3d 102 (another case which inspired a book), in which the evidence indicated that Manson and his followers entered the La Bianca house, subdued the residents, and took Mrs. La Bianca's wallet. Defendant left the house before his followers killed the residents. The court held that the question whether the robbery terminated before the murders was properly submitted to the jury, stating that assuming the La Biancas were still alive when defendant left the house, "the proximity in time of their subsequent death is sufficient to cement together the burglary-robbery and the homicides as one indivisible transaction." (Pp. 208-209.)

[17]Defendant also cites *Jones* v. *Superior Court* (1981) 123 Cal.App.3d 160 [176 Cal.Rptr. 430]. *Jones* held that a defendant who raped a woman, then transported her two miles before killing her, did not commit murder while "engaged in the commission of" rape, but instead while "engaged in . . . the immediate flight after committing" rape. The distinction between the commission of a crime and immediate flight comes from the 1978 death penalty initiative and, as *Jones* recognized, is inconsistent with prior felony-murder cases.

to complete a successful escape with the robbery proceeds, defendant either had to dispose of her, which he did, or flee to some other place which she could not identify for the police. Thus, the trier of fact could reasonably find that defendant's murder was a continuation of the robbery, done because until the robbery victim was killed, Fields' home was not a place of even temporary safety.[18]

Moreover, despite the span in space and time between the taking and the murder (see *People* v. *Ford, supra,* 65 Cal.2d 41), defendant's purpose in killing his victim serves to link the two crimes. As we noted, the record suggests two motives: to prevent her from reporting the crime (compare *People* v. *Ramos, supra,* 30 Cal.3d 553, 587; *People* v. *Sirignano, supra,* 42 Cal.App.3d 794, 801-802); and to punish her for attempting to frustrate the robbery (compare *People* v. *Carroll, supra,* 1 Cal.3d 581, 584-585). Such motives would not enable a court to find a killing occurred during the commission of a robbery if it took place days later and in a far distant locale. But here the murder occurred within a few hours of the robbery, and at a site only a few miles distant, and the events are linked not only by defendant's motives but by his continued control over the victim, forcing her to remain at his house and then transporting her to the murder site. We conclude that the evidence supports the verdict finding the special circumstance of murder during the commission of robbery.

V. *Insanity and penalty phase issues.*

(a) *"Antisocial personality" as a form of insanity.*

▉▉▉▉ Defendant, after presenting no defense of significance at the guilt phase of the trial, offered a defense of insanity. He presented evidence that he had an "antisocial personality" which, he claimed, constituted a form of insanity under the American Law Institute (ALI) test we endorsed in *People* v. *Drew* (1978) 22 Cal.3d 333, 339 [149 Cal.Rptr. 275, 583 P.2d 1318]. ▉▉▉▉ Under this test, a person is legally insane if "as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."[19]

---

[18]The fact that defendant took Rosemary away from the residence to kill her is also suggestive. Defendant may have wanted to prevent other persons, such as Debbie M., from witnessing the killing, or avoid having evidence of the killing in the house, because the existence of such witnesses or evidence would also render the house an unsafe refuge.

[19]An initiative measure effective June 8, 1982, enacted a statutory definition of insanity (see Pen. Code, § 25, subd. (b)) which resembles the M'Naghten test rejected by this court in *People* v. *Drew.* The considerations of policy barring extension of the insanity defense to psychopaths discussed in this opinion apply with equal force to cases arising under the new statutory definition.

We noted in *Drew* that "[s]ubdivision 2 of the American Law Institute test provides that 'the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.' This language, designed to deny an insanity defense to psychopaths and sociopaths, is not relevant to the present case. The question whether to adopt subdivision 2 of the ALI test is one which we defer to a later occasion." (22 Cal.3d at p. 345, fn. 8.) Forecasting that the California Supreme Court would adopt subdivision 2 of the ALI test, the trial judge in the present case instructed the jury in accord with that provision. The present case thus presents the issue we deferred deciding in *Drew*.

Defense counsel called as his only expert witness Dr. Ronald Markman, who testified that defendant suffered from an "antisocial personality" (the current psychiatric term for psychopaths and sociopaths),[20] that this condition is a "mental disease," and that because of this disease defendant was unable to conform his behavior to legal requirements. He described defendant as a person who lacks the interest, concern, or ability to conform to social roles, and was unable to benefit from experience. On cross-examination, however, he was asked whether his views would change if the term "mental disease" did not include an abnormality "manifested only by repeated or otherwise antisocial conduct." Markman replied that under this definition defendant would not be insane.

When the trial judge, over defendant's objection, instructed the jury on subdivision 2 of the ALI test, the defense case was destroyed. As the prosecutor pointed out to the jury, under subdivision 2's definition of mental disease, Dr. Markman agreed with the prosecution experts that defendant was sane, and no testimony whatever supported the insanity defense.

Before explaining our reasons for approving the court's instruction based on subdivision 2, it is important to note what that subdivision does and does not do. Although it was designed to deny an insanity defense to psychopaths and sociopaths (see *People* v. *Drew, supra,* 22 Cal.3d 333, 345, fn. 8; Model Pen. Code, § 4.01(2), com. (Tent. Draft No. 4, 1955)), it does not have that precise effect. What it does is prevent consideration of a mental illness if that illness is manifested only by a series of criminal or antisocial acts. If that illness manifests itself in some other way as well, then it can be considered as a "mental disease" under the ALI test, and instances of criminal or antisocial conduct can be ascribed to that disease or cited as evidence of its severity. (Thus Dr. Markham may have been mistaken when,

---

[20]The terms "psychopath" and "sociopath" are used interchangeably in the psychiatric literature; the newer term "antisocial personality" is roughly equivalent although, as we will explain later in this opinion, the profession has attempted to establish specific criteria for use of this term which may make it narrower than the earlier designations.

in response to a question excluding consideration of "an abnormality manifested only by repeated or otherwise antisocial conduct," he stated that "by definition, you are excluding the antisocial personality.")

In effect, subdivision 2 operates to define a prima facie case for an insanity defense: if the defense expert can point to no symptom, no manifestation, of defendant's condition except repeated criminal or antisocial acts, that condition cannot be considered grounds for finding defendant insane.[21] (See *United States* v. *Freeman* (2d Cir. 1966) 357 F.2d 606, 625.)[22] Whether this requirement denies the insanity defense to a person with an "antisocial personality" will depend upon the individual case, and on the ability of the psychiatrist to base a diagnosis upon facts additional to a list of defendant's criminal or antisocial acts.[23]

We advance three reasons for approving subdivision 2 of the ALI test. First, that provision has been endorsed by the overwhelming weight of authority. The recent Court of Appeal decision in *People* v. *Martin* (1981) 114 Cal.App.3d 739 [170 Cal.Rptr. 840], the only California decision since *Drew* to address the matter, expressly endorsed subdivision 2, and summarized the results in other jurisdictions. As explained in *Martin* (114 Cal.App.3d at p. 744, fn. 2), seven federal circuits have considered the issue, with five adopting subdivision 2 and two rejecting that provision; fourteen states have adopted subdivision 2 either through legislation or judicial decision. No state has rejected it.

Second, subdivision 2 is consistent with the majority view of psychiatrists and psychologists that proof of a series of criminal or antisocial acts is insufficient to demonstrate mental disease. The standard authority for classification and diagnosis of mental illness is the American Psychiatric Association's Diagnostic and Statistical Manual. The term "antisocial personality" first appeared in the second edition of this manual (DSM-II) in 1968.

---

[21]Defense counsel cites studies suggesting that persons with "antisocial personalities" may have electrical or chemical disorders. Proof of such a disorder in the case of a particular defendant might provide the prima facie showing that would avoid application of subdivision 2.

[22]As stated in *Freeman*: "There may be instances where recidivists will not be criminally responsible, but this will be for determination in each individual case depending upon other evidence of mental disease augmenting mere recidivism with the ultimate determination dependent upon the proper application of the standards we have adopted. But, we stress, repeated criminality cannot be the *sole* ground for a finding of mental disorder; a contrary holding would reduce to absurdity a test designed to encourage full analysis of all psychiatric data and would exculpate those who knowingly and deliberately seek a life of crime." (357 F.2d at p. 625.)

[23]Uelmen, *The Psychiatrist, the Sociopath and the Courts: New Lines for an Old Battle* (1980) 14 Loyola L.A. L. Rev. 1, 3-6, discusses the different views of psychiatrists concerning the diagnosis of "antisocial personality."

In defining that term, the manual stated explicitly that "[a] mere history of repeated legal or social offenses is not sufficient to justify this diagnosis." (DSM-II, p. 43.)[24]

The third edition of the Diagnostic and Statistical Manual (DSM-III), published in 1980, contains a detailed set of diagnostic criteria for diagnosis of antisocial personality. Summarizing the impact of the DSM-III criteria in light of the ALI insanity test, Dr. Seymour Pollack wrote that "[o]f importance to ALI insanity is the fact that the Antisocial Personality Disorder is identified by criteria other than the repetitive criminal offending and in addition to the essential antisocial attitudes and conduct characteristic of this Disorder. A mere history of repeated legal or social offenses is not, by itself, sufficient to justify this diagnosis . . . ." (Pollack, ALI Insanity in the Insanity Defense (1980) p. 60.)

Third, we foresee harmful legal and social consequences if an expert's diagnosis of mental illness and opinion of insanity could be based solely on recidivist behavior. If a pattern of antisocial behavior is sufficient basis for an insanity defense, then a substantial proportion of serious criminal offenders would be able to assert this defense. (See *People* v. *Martin, supra,* 114 Cal.App.3d 739, 745; Uelmen, *op. cit. supra,* 14 Loyola L.A. L. Rev. 1, 20-23.) It may be that few would succeed in persuading a jury. (See Pollack, *op. cit. supra,* p. 62.) But the assertion of the insanity defense by recidivists with no apparent sign of mental illness except their penchant for criminal behavior would burden the legal system, bring the insanity defense itself into disrepute, and imperil the ability of persons with definite mental illness to assert that defense.

We have considered carefully the views of the Ninth Circuit in *Wade* v. *United States* (9th Cir. 1970) 426 F.2d 64, the leading decision rejecting subdivision 2 of the ALI test.[25] The *Wade* court reasoned that it was preferable for dangerous psychopaths to be found insane, because a defendant convicted of crime must be released when he has served his sentence but

---

[24]The description of antisocial personality in DSM-II states that persons with this illness are those "who are basically unsocialized and whose behavior pattern brings them repeatedly into conflict with society. They are incapable of significant loyalty to individuals, groups, or social values. They are grossly selfish, callous, irresponsible, impulsive, and unable to feel guilt or to learn from experience and punishment. Frustration tolerance is low. They tend to blame others or offer plausible rationalizations for their behavior. A mere history of repeated legal or social offenses is not sufficient to justify this diagnosis." (DSM-II, p. 43.)

[25]The only other decision rejecting subdivision 2, *United States* v. *Smith* (6th Cir. 1968) 404 F.2d 720, 727, footnote 8, did so because the psychiatric profession did not agree on the correctness of the subdivision. The language from DSM-II and DSM-III, quoted earlier in this memorandum, however, indicates that the majority view in the profession supports the subdivision.

one found insane could be confined indefinitely. (426 F.2d at p. 72.) Such indefinite confinement of a person found insane, while possible under California law, is quite difficult. Penal Code section 1026.5 provides that a person found insane can be confined only for the equivalent of the maximum term of the underlying crime, unless that confinement is extended pursuant to subdivision (b) of that section. Subdivision (b) authorizes successive two-year extensions only if a jury finds the person still "represents a substantial danger of physical harm to others."

Against this asserted advantage of an insanity finding—an advantage which is nonexistent when the underlying crime carries a sentence of life imprisonment—we must balance a substantial disadvantage. To classify persons with "antisocial personality" as insane would put in the mental institutions persons for whom there is currently no suitable treatment (Uelmen, *op. cit. supra,* 14 Loyola L.A. L. Rev. 1, 20-21), and who would be a constant danger to the staff and other inmates. Mental hospitals are not designed for this type of person; prisons are.

Indeed, the "antisocial personality" is the classic criminal; our prisons are largely populated by such persons. To classify such persons as insane would radically revise the criminal law—insanity, instead of a rare exception to the rule of criminal accountability, would become the ordinary defense in a felony trial. Absent a better understanding of the disorder of "antisocial personality" and some effective treatment for this condition, such an expansive role for the insanity defense would work more harm than good.

(b) *Admissibility of photograph at penalty phase.*

At the penalty phase, the prosecution proved that defendant was convicted in 1976 of manslaughter of Albert A. The prosecutor then offered two photographs of the manslaughter victim. The judge examined the photographs and admitted one of them. Its gruesome character can be inferred from the fact that it depicts the battered body of the victim, who was beaten to death with a metal bar.

"The admission of photographs of victims lies primarily within the discretion of the trial judge who determines whether their probative value is outweighed by their prejudicial effect. [Citations.] Photographs which disclose the manner in which a victim was wounded are 'relevant on the issues of malice [citations] *and aggravation of the crime and the penalty* [citations].'" (*People* v. *Frierson* (1979) 25 Cal.3d 142, 171 [158 Cal.Rptr. 281, 599 P.2d 587] (opn. of Richardson, J.).)

The trial judge exercised her discretion, holding one of the offered photographs admissible "for the purpose of showing the violence of defendant's prior criminal act." On the record before us, we cannot find an abuse of discretion.

### (c) *Constitutionality of the death penalty.*

Defendant asks us to reconsider our decision in *People* v. *Jackson, supra,* 28 Cal.3d 264, holding the 1977 death penalty legislation constitutional. He presents no new arguments, but simply urges the views advanced by the dissenting justices in that case. We see no reason to reopen the issue.

### VI. *Summary and Conclusion.*

Defendant was found guilty of the murder of Rosemary C. and 13 other offenses. The jury found the special circumstance of murder during the commission of a robbery, determined that defendant was sane, and fixed the penalty at death. Substantial evidence supports the jury's verdict in all respects.

On appeal, defendant raised constitutional issues concerning the selection of the jury, claiming (a) that certain prospective jurors were improperly excluded because of their views on capital punishment, and (b) that the exclusion of jurors on that basis from the guilt phase of the trial denied him his right to a representative jury. We have concluded, however, that the jurors in question were properly excluded because they would automatically vote against the death penalty in the present case regardless of the evidence. The exclusion of such jurors serves the state's interest in selecting a single jury to try both guilt and penalty, and in eliminating jurors who might not render an impartial verdict. It does not abridge any right of defendant under the state or federal Constitutions.

Defendant also questioned the instruction and sufficiency of the evidence as to the special circumstance of felony murder. As we have explained, however, any instructional error was to defendant's benefit. The evidence that defendant killed Rosemary C. to punish her for resisting the robbery and to prevent her from reporting that crime demonstrates that the robbery and murder were part of a continuous transaction, and thus that the killing occurred "during the commission" of the robbery.

Defendant relied primarily on a defense of insanity. His appeal raised the question whether the ALI test of insanity as applied in this state at date of trial excludes abnormalities manifested only by repeated criminal acts. We hold that it does exclude such conditions, and thus that the trial court did

not err in so instructing the jury. With that holding, defendant's only defense evaporates.

In light of the evidence that defendant murdered Rosemary C. wilfully, deliberately, with premeditation and during the commission of a robbery, and that defendant was sane when he committed this act, minor errors relating to the voir dire of one juror and to the guilt phase argument of the prosecutor did not prejudice the outcome of the case.

The judgment is affirmed.

Mosk, J., and Richardson, J., concurred.

KAUS, J. ▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ I concur in full in the reasoning and conclusions of the majority opinion with the exception of part III (a).[1] With respect to that part, I concur only in the result.

Assuming, as I must in light of *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], that it has not yet been established that the "death qualification" procedure results in a jury that is biased against a defendant on the issue of guilt or innocence, I believe that the state's interest in having a single jury determine the defendant's guilt or innocence and decide whether he should live or die, is sufficient to justify the exclusion from the guilt phase of those jurors who cannot sit at the penalty phase because they are unalterably opposed to the death penalty. As the majority recognizes (*ante,* pp. 351-352), the use of a single jury in capital cases serves a number of significant substantive purposes beyond the more obvious savings in time and expense.

I would rest the holding in part III (a) solely on the weightiness of the justifications supporting a single jury procedure in death penalty cases, without deciding whether "guilt phase includables" are—in the abstract—a "cognizable class" for *Duren* purposes. In addition, because of the obvious differences between peremptory challenges and broad statutory exclusions, I would not suggest that simply because an individual who holds a particular

---

[1]My concurrence in part III (b) rests on my understanding that—in light of footnotes 11 and 13, pages 381, 384, *ante*—the majority does not intend to approve the routine framing of the *Witherspoon* inquiry in the form of a question which asks prospective jurors whether they would consider the death penalty "in this case," but rather that the opinion simply finds no prejudice here where it appears that the jurors to whom the question was posed had no knowledge of any facts of this case beyond the bare language of the charged special circumstances. I certainly agree that the trial court did not err in precluding defendant from attempting to rehabilitate *Witherspoon*-excludable jurors by asking such hypothetical questions as whether they would consider the death penalty if the defendant were Adolf Hitler.

viewpoint may properly be the subject of a peremptory challenge under *Wheeler,* no cross-sectional-jury problems would be raised by a statutory across-the-board exclusion of all individuals who entertain similar views. As I see it, the constitutional standards governing the two situations—peremptory challenges, on the one hand, and statutory exclusions, on the other—are not necessarily the same.[2]

**BIRD, C. J.,** Dissenting.—When an individual is accused of a noncapital crime in California, the jurors who decide the question of guilt or innocence are drawn from virtually the entire population of fair and impartial, English-speaking adults in the community. (See Code Civ. Proc., §§ 198-202.5; Pen. Code, §§ 1071-1074.) However, when an individual's life hangs in the balance, the state alters that jury pool. Excluded for all purposes is any adult who would not vote for a death sentence even though that person could fairly decide the question of guilt or innocence.

In *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], this court attempted to determine whether significant and relevant differences exist between the jury pool used for the trial of the "usual" criminal case and the more limited "death-qualified" pool used for the determination of guilt or innocence in a death penalty case. The evidence presented in *Hovey* focused on the effect of the state's exclusion of those fair and impartial jurors who would be unwilling to consider imposing a death sentence. That evidence established, and this court acknowledged, that this group—called the "guilt phase includables"—differed on the average from the remaining fair and impartial jurors in such important matters as (1) its votes on guilt or innocence, (2) its attitudes toward the law and the criminal justice system, (3) its racial and sexual composition, (4) its

---

[2]As in *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], the State Public Defender has filed an amicus brief in support of a grant of a rehearing in this case in which he raises a host of issues that were not presented by appointed counsel before we filed our opinion in this case. Although in *Easley* I felt that the seriousness and fundamental nature of the errors raised by the public defender necessitated a grant of a rehearing, in this case I believe that the general interest in an orderly presentation and resolution of issues would be best served by leaving defendant free to raise the newly discovered issues in appropriate collateral proceedings. (E.g., *In re Banks* (1971) 4 Cal.3d 337 [93 Cal.Rptr. 591, 482 P.2d 215]; *In re Smith* (1970) 3 Cal.3d 192 [90 Cal.Rptr. 1, 474 P.2d 969]; *In re Saunders* (1970) 2 Cal.3d 1033 [88 Cal.Rptr. 633, 472 P.2d 921]; cf. *People* v. *Lang* (1974) 11 Cal.3d 134, 141 [113 Cal.Rptr. 9, 520 P.2d 393].) The public defender's voluminous brief here—coming so quickly on the heels of the similar presentation in *Easley*—suggests to me that it is unrealistic to expect us to unearth all potentially meritorious claims of error on our own in cases of this length and complexity. Granting a rehearing whenever a new claim of error is presented has the disadvantage of denying lower courts the benefit of this court's definitive resolution of those issues which we have already considered and addressed. Because many of these issues continue to arise in current death penalty litigation, guidance on which trial courts can rely is particularly important. Given these considerations, I have concluded that I should vote to deny the petition for rehearing.

evaluation of evidence, and (5) its assessment of the "reasonable doubt" standard. In each instance, the "guilt phase includable" group was less prosecution-prone—or more defense-oriented—than the remaining jurors.

Nevertheless, this court rejected the contention, based on *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 520, footnote 18 [20 L.Ed.2d 776, 784, 88 S.Ct. 1770], that a death-qualified jury pool is "less than neutral with respect to *guilt*" when compared with the jury pool employed in other criminal cases in California. (See *Hovey* v. *Superior Court, supra,* 28 Cal.3d at pp. 63-69.) The fundamental defect in petitioner's showing was his failure to recognize that a death-qualified jury pool differs from the usual criminal jury pool not only with respect to the exclusion of individuals unalterably *opposed* to voting for death but those who would always vote *in favor of* death. The studies presented by petitioner erroneously assumed that the latter group—the "automatic death penalty" group—was eligible to serve on capital juries. The data were not capable of being adjusted to account for that assumption, since neither the size, the behavior, nor the characteristics of the group were established.

Petitioner's showing made it impossible to ascertain whether the exclusion of the "automatic death penalty" group would offset the effects of the exclusion of the "guilt phase includable" group and hence leave the jury pool in death penalty cases identical to the jury pool in nondeath cases. In view of this problem and the fact that the burden lay with petitioner to make a prima facie showing of unconstitutionality, petitioner's *Witherspoon* contention was "rejected as not established by the record presently before this court." (*Hovey* v. *Superior Court, supra,* 28 Cal.3d at p. 61.)

The petitioner in *Hovey* declined to argue, and this court specifically reserved for a future case, whether the exclusion of the "guilt phase includable" group violated the fair cross-section requirement of our state and/or federal Constitutions. (Cal. Const., art. I, § 16; U.S. Const., 6th Amend. See *Hovey* v. *Superior Court, supra,* 28 Cal.3d at pp. 17-18, fn. 38.) A primary difference between a fair cross-section analysis and the "neutral jury" analysis of *Witherspoon* and *Hovey* is that under cross-section principles, the state cannot justify its exclusion of a " 'distinctive' group in the community"[1] by claiming that the removal of another group "offsets" the effects of the challenged exclusionary policy. (Accord, maj. opn., *ante,* at p. 349, fn. 7; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 283, fn. 30 [148 Cal.Rptr. 890, 583 P.2d 748].) For example, a jury pool from which blacks were excluded would not fairly represent the community if prejudiced

---

[1]*Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 586-587, 99 S.Ct. 664].

whites were also removed, nor would the exclusion of misogynists restore cross-sectional balance to a jury pool devoid of women.

A majority of this court today admit that under a cross-section analysis, "the exclusion of one group could not be justified by excluding another sect with opposite views." (Maj. opn., *ante,* at p. 349, fn. 7.) Nevertheless, they manage to reject the argument that exclusion of the "guilt phase includable" group violates fair cross-section principles. They do this by concluding that the "guilt phase includable" group is not "distinctive," i.e., that its members are "united only by their determination to vote automatically against the death penalty [and are as] divided in all else" as persons permitted to serve on capital juries. (*Id.,* at p. 349.)

These conclusions are entirely unsupported in the majority opinion and, in fact, are unsupportable. They are flatly contradicted by the *Hovey* decision and by the consistent results of each of the two dozen studies discussed therein. Unfortunately, all of this empirical data and precedent are simply ignored by today's majority.

By any of the standards heretofore used by this court for determining a "cognizable class" or a "distinctive group in the community" under a fair cross-section analysis, the "guilt phase includables" would qualify as cognizable or distinctive. In order to hold that they do not, the majority must ignore not only precedent and proof, but leave behind common sense as well.

As the reader may have surmised, I respectfully dissent.[2]

## I.

The right to a jury drawn from a representative cross-section of the community is guaranteed by both the state and federal Constitutions. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 272; *Taylor* v. *Louisiana* (1975) 419 U.S. 522, 528, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692].) However, not every exclusionary jury selection practice of a state is barred by cross-section principles. To establish a prima facie cross-sectional violation, an individual challenging a particular state practice must show, inter alia, that it adversely affects what the United States Supreme Court has variously called an "identifiable class of citizens,"[3] a "'distinctive' group in the community,"[4] a

---

[2]Since I would reverse appellant's conviction for the fair cross-section violation, I do not address the other issues discussed in the majority opinion.

[3]*Taylor* v. *Louisiana, supra,* 419 U.S. at page 525 [42 L.Ed.2d at page 695].

[4]*Duren* v. *Missouri, supra,* 439 U.S. at page 364 [58 L.Ed.2d at page 587]; accord, *Taylor* v. *Louisiana, supra,* 419 U.S. at page 538 [42 L.Ed.2d at page 703].

"large, distinctive group[],"[5] and a "minorit[y] or other identifiable group[]."[6]

This court, in turn, has looked for a "common thread running through the excluded group—a basic similarity of attitudes, ideas or experience among its members . . . ." (*Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 60 [115 Cal.Rptr. 247, 524 P.2d 375]; *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 97-98 [154 Cal.Rptr. 734, 593 P.2d 595] (lead opn. of Mosk, J.).) Frequently the term "cognizable" class or group has been employed to describe this aspect of the representative cross-section requirement.[7] The court has observed that "economic, sexual, social, religious, racial, political, or geographical groups" are cognizable. (*Adams* v. *Superior Court*, *supra*, 12 Cal.3d at p. 60; see also *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 220 [90 L.Ed. 1181, 1184-1185, 66 S.Ct. 984, 166 A.L.R. 1412].) It is significant for the consideration of this case that of these several groups, only two are defined by reference to an immutable characteristic (i.e., sex and race). The remainder are defined by some shared attribute which can change from year to year, or even day to day.

Even more to the point, several of these cognizable or distinctive groups— e.g., the religious and political groups—are defined solely by reference to their members' attitudes and beliefs. Indeed, in *Adams* v. *Superior Court*, *supra*, 12 Cal.3d at page 60, this court refused to find a group to be cognizable precisely *because* its members lacked a "basic similarity of attitudes, ideas or experience . . . ." This is so because "the goal of the cross-section rule is to enhance the likelihood that the jury will be representative of significant community *attitudes*, not of groups per se." (*Rubio* v. *Superior Court*, *supra*, 24 Cal.3d at p. 98, original italics (lead opn. of Mosk, J.).) Thus, in the present case, the fact that the "guilt phase includable" group is defined by reference to its members' attitudes and beliefs would seem to support a finding that it is a "cognizable class" or a "distinctive group in the community."[8]

---

[5]*Id.*, at page 530 [42 L.Ed.2d at page 698]; accord, *People* v. *Wheeler*, *supra*, 22 Cal.3d at page 269.

[6]*Ballew* v. *Georgia* (1978) 435 U.S. 223, 236-237 [55 L.Ed.2d 234, 244, 98 S.Ct. 1029].

[7]See, e.g., *People* v. *Wheeler*, *supra*, 22 Cal.3d at page 280; *Adams*, *supra*, 12 Cal.3d at page 60.

[8]In *Adams*, this court suggested that persons opposed to the death penalty constitute a cognizable class. (12 Cal.3d at p. 60.) It is therefore doubly perplexing to find in today's majority opinion the assertion that the United States Supreme Court's decision in *Witherspoon* v. *Illinois*, *supra*, 392 U.S. 510, "can be viewed as an implied holding that exclusion of persons opposed to capital punishment does not deny a defendant a representative jury at the guilt trial." (Maj. opn., *ante*, at pp. 344-345.)

First, *Witherspoon* was not a fair-cross-section case. The federal fair-cross-section re-

Nevertheless, this court today refuses to hold that the "guilt phase includables" comprise a "cognizable" or "distinctive" group. It is the basic contention of the majority that the members of this group have only a single attitude or belief in common—i.e., their "unwillingness to vote for death"—and that this shared attribute is insufficient to render them a "cognizable" or "distinctive" group. (Maj. opn., *ante,* at p. 349.) This contention cannot withstand close scrutiny.

At the outset, the premise underlying the majority's reasoning is the belief that "the courts have not recognized an otherwise heterogeneous group as cognizable merely because its members agree on one particular matter." (Maj. opn., *ante,* at p. 349.) The majority purport to rely on *People* v. *Wheeler, supra,* 22 Cal.3d 258, but *Wheeler* actually refutes their premise. There, in suggesting how a litigant might establish that peremptory challenges were being used improperly to exclude jurors for group association, this court indicated that the litigant might demonstrate that the excluded jurors "share only this one characteristic—their membership in the group— and that in all other aspects they are as heterogeneous as the community as a whole." (22 Cal.3d at p. 280.)

Moreover, the majority's belief that an "otherwise heterogenous group" cannot be cognizable was expressly rejected as "fallacious" in Justice Mosk's lead opinion in *Rubio* v. *Superior Court, supra,* 24 Cal.3d at page 99. Responding to the contention that ex-felons and resident aliens were not

---

quirement flows out of the Sixth Amendment. (*Taylor* v. *Louisiana, supra,* 419 U.S. 522.) At the time of Witherspoon's trial, the Sixth Amendment was not applicable to the states. (*DeStefano* v. *Woods* (1968) 391 U.S. 631 [20 L.Ed.2d 1308, 88 S.Ct. 2093]; *Duncan* v. *Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444].) This court has previously noted that *Witherspoon* was decided on due process "neutrality" principles and involved an analysis different from that of the cross-section requirement. (*Hovey* v. *Superior Court, supra,* 28 Cal.3d at pp. 17-18, fn. 38.) A "neutrality" analysis need not involve cognizable classes. (*Id.,* at p. 20, fn. 45.)

Moreover, even if *Witherspoon* were viewed as a cross-section case, the majority's interpretation of the case would be puzzling, since in *Adams* v. *Superior Court, supra,* 12 Cal.3d at page 60, this court suggested that *Witherspoon* supports the opposite interpretation. *Adams* cited *Witherspoon* for the proposition that "the exclusion of other groups [in addition to economic, sexual, social, etc. groups] might also be improper." Today's majority leaps to a contrary conclusion without even acknowledging our discussion in *Adams.*

A recent federal court decision notes that the "*Witherspoon* argument" utilized by today's majority "keeps cropping up despite the obviousness of the answer thereto." (*Grigsby* v. *Mabry* (E.D. Ark. 1983) 569 F.Supp. 1273, 1286.) The *Grigsby* court points out that the argument not only erroneously views *Witherspoon* as a Sixth Amendment case, but also conflicts with the fundamental premise underlying *Witherspoon* that "[i]nclusion, not exclusion [of community groups], must be the basic rule." (569 F.Supp. at p. 1284. See also *Hovey* v. *Superior Court, supra,* 28 Cal.3d at pp. 19-20, 21, and 66, fn. 113.) Under *Witherspoon,* penalty phase juries must be "as representative as can be" and include "all of those, but only those, who can honestly swear that they are able and willing to try the penalty issue in accordance with law of the state and the evidence presented." (569 F.Supp. at pp. 1286-1287.)

cognizable groups because they were "heterogenous in all other respects," Justice Mosk wrote, "[t]he argument is fallacious, and proves too much: it could equally well be applied to the women excluded in *Taylor* v. *Louisiana, supra,* the blacks in *Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163], and our decision in *Wheeler,* and the daily wage earners excluded in *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217." (24 Cal.3d at p. 99.)

Not only is the majority's underlying premise questionable, the logic of the opinion is unsupportable on its face.

The majority hold that the distinctiveness of the "guilt phase includables" is limited to the group's unwillingness to vote for a death sentence. In "all other matters," the group is said to be the same as the remaining jury pool. As an initial hypothesis, this assertion is, I suppose, arguable in the abstract. However, a few moments of thought should suggest it is not very plausible.

As amicus curiae observe, we are dealing here with values or beliefs so deeply held that the individuals holding them will forthrightly refuse to act against them, even in the face of the law's insistence that they serve as jurors if they can consider voting for a death sentence in at least some cases. Values this strongly felt are likely to be an integral part of an individual's basic system of beliefs and overall outlook. It is not very likely that such values will exist in random isolation, like a preference for strawberry ice cream which has no interrelationship with individuals' attitudes, values, and beliefs about the world around them. Therefore, as an abstract proposition, the majority's assumption about the limited differences between the "guilt phase includables" and the other persons remaining in the jury pool seems to contradict common sense.

However, it is quite unnecessary to debate about what "seems" to be more likely. For, just three years ago, this court found, based on the uniform results of over 20 empirical studies, that the "guilt phase includables" tend to differ from the rest of the jury pool in many matters in addition to their unwillingness to vote for a death sentence. (*Hovey* v. *Superior Court, supra,* 28 Cal.3d at pp. 26-69.)

Thus, the court found that the "guilt phase includables" tend to differ in (1) the votes they cast on guilt or innocence and on lesser included offenses (28 Cal.3d at pp. 26-42); (2) their attitudes toward the criminal justice system, toward basic principles of criminal law, and toward the litigants (*id.,* at pp. 43-54); and (3) their evaluation of evidence and their assessment of the reasonable doubt standard (*id.,* at pp. 57-60). In each respect, the "guilt phase includables" were found to be less prosecution-oriented on the average than the remaining jurors. In addition, the "guilt phase includable"

group was found to contain a higher percentage of blacks and women than the rest of the jury pool. (*Id.*, at pp. 54-57.)

Without reiterating this evidence in detail, it is sufficient to observe that the evidentiary support for these findings was both consistent and overwhelming. The court even noted the "boring regularity" and the "almost monotony of the results," which were consistent regardless of what categories of people were studied or how the study was designed. (28 Cal.3d at pp. 40, 57, 63.)[9] As one commentator has subsequently observed, "[t]hese studies clearly establish that an individual's attitude toward capital punishment is not an isolated phenomenon, but rather is closely related to other deeply held attitudes and values." (Winick, *Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis* (1982) 81 Mich. L.Rev. 1, 71 [hereafter, *Winick*].)[10]

If this evidence is considered, it is virtually impossible to conclude that the "guilt phase includable" group is not "distinctive" or that it does not differ from the remaining jurors on many significant matters in addition to an unwillingness to vote for a death sentence. Indeed, today's majority do not attempt to harmonize their assumptions with this evidence. They simply ignore it.

The result is a court decision premised on an assumption that has already been demonstrated to be incorrect, and one which is at odds not only with common sense but with reality.

## II.

The majority go on to suggest that even if the "guilt phase includables" were distinctive or cognizable, the state's interests in excluding the group

---

[9]The issue in *Hovey* was whether the exclusion of the "guilt phase includable" group resulted in a nonneutral jury on the issue of guilt or innocence. *Hovey* rejected that claim, but not on the basis that the "guilt phase includables" were indistinguishable from the remaining jurors on matters other than willingness to impose a death sentence.

Rather, as I have explained, the *Hovey* court found that the "guilt phase includable" group was distinctive but that petitioner had failed to account for the possibility that this distinctiveness might be offset by the state's exclusion of another group with possibly *opposite* attitudes and tendencies—the "automatic death penalty" group. Obviously, this possibility in no way casts doubt upon the conclusion that the "guilt phase includables" are themselves a distinctive class.

[10]See *Grigsby* v. *Mabry, supra,* 569 F.Supp. 1273. There, the court reviewed the *Hovey* studies and found that death penalty attitudes are "intimately tied to other attitudes and views which are directly implicated when jurors determine the guilt or innocence of a defendant in a criminal trial." (*Id.,* at p. 1283.) In striking down as a cross-section violation the same jury exclusionary practices that are involved in the present case, the *Grigsby* court found that "those excluded by death qualification are a distinct group and that no other of the death-qualified groups, not even those who hold milder scruples against the death penalty, can adequately represent their point of view or life perspective." (*Id.,* at pp. 1293, 1304.)

would outweigh any competing interests in having them included in the guilt phase jury pool.[11] I disagree. The state's interests turn out to be insubstantial or fictitious, whereas the competing interests in an accurate verdict, when an individual is on trial for his or her life, are paramount.

The first concern that the majority speak to is "the expense and inconvenience involved" in any departure from the practice of using the same 12 jurors to decide both guilt and penalty. (Maj. opn., *ante*, at pp. 350-351.) However, the majority overlook the fact that "restrictions upon authority for securing personal liberty, as well as fairness in trial to deprive one of it, are always inconvenient—to the authority so restricted." (*In re Oliver* (1948) 333 U.S. 257, 280-281 [92 L.Ed. 682, 698, 68 S.Ct. 499] (conc. opn. of Rutledge, J.).)

In fact, the additional expense would appear to be relatively modest, for these trials are but miniscule in number and are a very small percentage of the total trials statewide. Further, the potential number of death penalty trials always exceeds the actual penalty phase trials since, as the majority opinion notes, "many cases terminate before reaching the penalty phase." (*Ante*, at pp. 350-351.)

The attempt to justify the exclusionary policy on financial grounds fails for another reason. As one commentator has observed, "precisely these interests were held insufficient for a state's attempt to reduce the size of misdemeanor juries to five members." (*Winick, op. cit. supra,* 81 Mich. L.Rev. at p. 58, citing *Ballew* v. *Georgia, supra,* 435 U.S. at p. 244 [55 L.Ed.2d at p. 249].) "The five-member jury would have applied in all misdemeanor trials, an enormous number of cases, and therefore would have resulted in considerable cost savings to the state even if the savings in each individual case were minimal. As capital cases make up a relatively small

---

[11]These various interests are discussed by the majority in the context of an equal protection challenge to the exclusion of the "guilt phase excludables" in capital cases. The majority apparently apply the "rational basis" standard to reject this claim, but they recognize that a stricter standard would apply if a prima facie cross-section violation were established. As the United States Supreme Court has held, " '[t]he right to a proper jury cannot be overcome on merely rational grounds,'[]. Rather, it requires that a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." (*Duren* v. *Missouri, supra,* 439 U.S. at pp. 367-368 [58 L.Ed.2d at p. 589], fn. omitted, quoting *Taylor* v. *Louisiana, supra,* 419 U.S. at p. 534 [42 L.Ed.2d at p. 700].)

Since the majority reject appellant's cross-section claim on the ground that the "guilt phase includable" group is not distinctive, they do not reach the question as to whether the state can justify the exclusion of this group under cross-section principles. However, I assume that they would find basically the same interests to be involved in the cross-section context as in the equal protection setting. Whether the stricter standard would cause them to arrive at a different result than they reach under their equal protection analysis, I would hesitate to predict.

number of criminal trials, the savings here would be considerably less. Moreover, in view of the [United States Supreme] Court's inclination to demand more in the way of due process in capital cases than in any other kind of case, it would seem that if the greater cost savings accomplished in the five-member misdemeanor jury context were deemed insufficient justification for the resulting infringement on defendant's jury trial rights, then *a fortiori* the lesser savings would be deemed insufficient in the capital punishment context." (*Winick, op. cit. supra,* 81 Mich. L.Rev. at pp. 58-59. See also *Grigsby* v. *Mabry, supra,* 569 F.Supp. at pp. 1319-1321.)

The final justification offered to support the exclusion of the "guilt phase includable" group is a claimed interest in excluding jurors whose "belief[s] as to the inappropriateness of the death penalty will improperly skew the determination of guilt or innocence . . . ." (Maj. opn., *ante,* at pp. 351-352.) Although the "guilt phase includables" swear they will be fair and impartial in deciding guilt or innocence, the majority distrust their declarations, apparently believing that they will in fact have difficulty rendering an impartial verdict at the guilt and special circumstances phase of a death penalty trial.

Initially, this asserted state interest cannot be used to justify a state exclusionary policy unless it "can realistically be ascribed to the Legislature." (See *Cooper* v. *Bray* (1978) 21 Cal.3d 841, 854 [148 Cal.Rptr. 148, 582 P.2d 604].)[12] The Legislature has never expressed any concern that individuals who are unalterably opposed to the imposition of a death sentence are likely to be biased on the question of guilt or innocence. Indeed, language contained in the relevant statutory provision clearly suggests the contrary. (See Pen. Code, § 1074, subd. 8.)

The Legislature has required the exclusion of any juror "entertaining . . . such conscientious opinions as would preclude his finding the defendant guilty . . ." in a death penalty case. (Pen. Code, § 1074, subd. 8.) The very wording of the statute reveals a legislative judgment that not all "conscientious opinions" would "preclude [a juror from] finding the defendant guilty." If the Legislature had believed that jurors with conscientious opinions could not be trusted to find a defendant guilty when warranted by the evidence, it would not have limited this exclusionary policy to only those individuals "entertaining . . . *such* conscientious opinions *as would preclude [their] finding the defendant guilty.*" Obviously, the Legislature does

---

[12]*Cooper* v. *Bray* involved an equal protection challenge to a statute, and the court applied the "rational basis" test. *Cooper* was not a representative cross-section case.

There is no reason to refuse to apply *Cooper*'s "actual purpose of the Legislature" test in the present context since a cross-sectional analysis requires the application of a stricter standard of review than merely "rational basis." (See *ante,* at p. 354, fn. 11.)

not share the unsupported conjecture of the majority that the "guilt phase includables" will deliberately lie or are deluding themselves when they swear they can be fair and impartial on the issue of guilt or innocence.

Nor would such a concern be consistent with other statutory provisions or legal principles. The general rule is that a juror's declaration that he or she can be fair and impartial "must be presumed to be true." (*People* v. *Preston* (1973) 9 Cal.3d 308, 313 [107 Cal.Rptr. 300, 508 P.2d 300].) Indeed, the Legislature has extended this principle so far that even when a juror has actually formed or expressed an opinion concerning guilt prior to trial, the juror cannot be excluded for cause if "it appear[s] to the court, upon [the juror's] declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly upon the matters to be submitted to him." (Pen. Code, § 1076.) Clearly, subdivision 8 of section 1074 does not embody a legislative judgment that "guilt phase includables" cannot be trusted when they swear to be fair on the question of guilt.

This court, too, has recognized on several occasions that the "guilt phase includables" can act impartially as to a determination of guilt. Although the court has previously upheld the exclusion of the group from capital trials, it has specifically noted "their ability to fairly and impartially determine defendant's guilt." (*People* v. *Washington* (1969) 71 Cal.2d 1061, 1089-1090 [80 Cal.Rptr. 567, 458 P.2d 479].) Recently, the court reiterated its view that "many jurors who are unable to be fair and impartial at the penalty phase would be capable of giving a fair hearing as to the issues of guilt or innocence. Therefore, it follows that when a 'death-qualified' jury pool is used to select jurors for the guilt phase of a [capital] trial, prospective jurors are excluded who could be fair and impartial at that phase." (*Hovey* v. *Superior Court, supra,* 28 Cal.3d at p. 22, fn. 54.)

There are sound reasons why neither the Legislature nor this court has taken the position that "guilt phase includables" find it difficult to be impartial when deciding guilt or innocence. Simply put, "[i]t in no way follows that people who have strong feelings against the death penalty do not wish to see persons guilty of capital crimes convicted and punished." (*Grigsby* v. *Mabry, supra,* 569 F.Supp. at p. 1313.) The members of this group forthrightly declare their inability to serve at the penalty phase, and these statements are accepted at face value. Why then would their sworn declarations as to the guilt phase be called into question? Do the majority truly believe that these jurors, having openly excluded themselves from the penalty determination, will nevertheless strive to sit on the guilt phase jury just to thwart a capital prosecution or that they have abruptly lost the capacity to assess their own abilities? I submit such a view is unwarranted.

Jurors who strongly oppose capital punishment cannot even be excluded from the *penalty* trial unless they "ma[k]e unmistakably clear" that they would automatically vote against a death sentence or would be biased as to the issue of guilt. (*Witherspoon* v. *Illinois, supra,* 391 U.S. at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785].) Death penalty opponents are trusted to make that judgment despite their views on capital punishment. Do jurors suddenly lose the ability to speak truthfully just because they declare—truthfully—that they cannot vote to impose death?[13]

Even when prospective jurors "frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt," they may not constitutionally be excluded from the jury on that basis. (*Adams* v. *Texas* (1980) 448 U.S. 38, 50 [65 L.Ed.2d 581, 593, 100 S.Ct. 2521].) "Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law." (*Ibid.* [65 L.Ed.2d at p. 593].) If a venireperson making the explicit declarations discussed in *Adams* cannot constitutionally be excluded for alleged bias, then it is difficult to understand the majority's assertion in the present case that persons who do *not* make such admissions *may* be constitutionally excluded for the identical alleged bias.

In the end, this entire issue concerning alleged juror nullification by death penalty opponents is a red herring. When the United States Supreme Court decided in *Witherspoon* that many individuals who had doubts about the death penalty should be allowed to serve on capital case juries, prosecutors claimed that the inclusion of this group would mean the de facto end of capital punishment. (See Meltsner, Cruel and Unusual (1973) p. 124.) How wrong they were. The reasoning of today's majority is nothing more than an unsubstantiated assertion of those same unjustified claims.[14]

The majority find the accused's interest to be "not a very substantial [one]." (Maj. opn., *ante,* at p. 353.) It is said to be merely an interest in having "an elusive but 'distinct quality' or 'flavor'" brought to the jury

---

[13]If there is a valid concern that individual members of the "guilt phase includable" group may not be impartial, that can be explored through voir dire.

[14]As Justice Jackson, a former prosecutor, has written, "prosecutors seldom fail to stress, if not exaggerate, the importance of the case before them to the whole social, if not the cosmic, order." (*Frazier* v. *United States* (1948) 335 U.S. 497, 515 [93 L.Ed. 187, 200, 69 S.Ct. 201] (dis. opn.).)

Justice Mosk of this court, himself a former California Attorney General, concurs with Justice Jackson. (See *People* v. *Uhlemann* (1973) 9 Cal.3d 662, 670 [108 Cal.Rptr. 657, 511 P.2d 609] (dis. opn.).)

room by the "guilt phase includables." (*Ibid.*) This view ignores the studies which indicate that the "guilt phase includables" would tend to bring to many juries distinctive attitudes and viewpoints which have a bearing on how the evidence should be evaluated, credibility judged, and reasonable doubt assessed. (See *Winick, op. cit. supra,* 81 Mich. L.Rev. at p. 66.)

Moreover, even if the "guilt phase includable" group brought nothing more than a certain "quality" or "flavor" to the jury room, that would be a sufficient constitutional interest. Indeed, the United States Supreme Court, in striking down statutes which excluded women from criminal juries, found that "'a flavor, a distinct quality is lost if either sex is excluded.'" (*Taylor* v. *Louisiana, supra,* 419 U.S. at p. 532 [42 L.Ed.2d at p. 699], quoting *Ballard* v. *United States* (1946) 329 U.S. 187, 194 [91 L.Ed. 181, 186, 67 S.Ct. 261].) If such an interest was sufficient to sustain a cross-section challenge in *Taylor,* why not here?[15]

It should be remembered that the defendant is on trial for his life in these cases. That alone should cause this court to be careful in its assessment of the competing interests. If only one of the interests identified by the accused was held to be sufficient in *Taylor* v. *Louisiana, supra,* 419 U.S. 522, and there are a number of other important interests asserted, the balance would

---

[15]The majority opinion suggests that use of a single, death-qualified jury will actually benefit the accused, because it will guarantee that the penalty phase jury is aware of "lingering doubts" that may have survived the guilt phase deliberations. (Maj. opn., *ante,* at pp. 351-352.) This idea is similar to one expressed in a Fifth Circuit decision, which opined that empaneling a second jury for a penalty trial would deprive the accused of the benefits of whatever "whimsical doubt" as to guilt the jury might carry over into its penalty deliberations. (*Smith* v. *Balkcom* (5th Cir. 1981) 660 F.2d 573, 579-582.) Whether this doubt is "lingering" or "whimsical," it is an unsatisfactory basis for upholding the single-jury scheme.

First, there is not the slightest indication that such a defendant-protective purpose was ever contemplated by our Legislature in enacting the statute which authorizes the removal of the "guilt phase includables." (Pen. Code, § 1074, subd. 8.) Indeed, the words of the statute contradict such a conclusion. The statute orders the removal of any prospective juror whose death penalty views "preclude his finding the defendant guilty," and it is difficult to view such exclusions as intended to benefit the defendant.

Moreover, as Professor Winick has written, "whether a capital defendant would be more disadvantaged by the destruction of the 'whimsical doubt' that would accompany the bifurcated trial remedy than he would by a unitary trial system in which 'automatic life imprisonment' jurors would be excluded from the determination of guilt is itself an unexplored empirical question. In any event, the ["lingering" or "whimsical" doubt] approach seems unduly paternalistic. The state's substantial interest in a penalty jury capable of imposing capital punishment in accordance with the state's statutory scheme can be satisfied either by removal of 'automatic life imprisonment' jurors from participation in the determination of both guilt and punishment, or by the bifurcated trial mentioned in *Witherspoon.* As the state's interest in avoiding added costs should not itself justify the existing system, it would seem appropriate to allow a defendant himself to resolve the question as to which alternative would be more consistent with his own interests." (*Winick, op. cit. supra,* 81 Mich.L.Rev. at pp. 60-61, fns. omitted.)

appear to clearly support including rather than excluding the "guilt phase includable" group.

Since I sincerely believe that the majority have misapplied the law, I must respectfully dissent.

**REYNOSO, J.,** Dissenting.—I agree fully with the analysis found in the Chief Justice's dissenting opinion: the exclusion of the jurors who do not believe in the death penalty[1] violates the fair cross-section requirement of our state and federal Constitutions.

This separate dissent proposes what appears to me to be a practical response to the long lasting quandary: how can we assure a fair jury yet accommodate the required dual procedure, a guilt hearing followed, if needed, by the penalty phase. Rather than urging two separate juries, I would replace some of the original jurors with alternates. Views on the death penalty should not be a basis for removal of jurors in the guilt phase. However, at the penalty phase jurors who cannot enforce the death penalty may be replaced. Thus, one jury is preserved.

The availability of such a procedure would render particularly insubstantial the state's interests in completely excluding such a group from capital juries. Administrative convenience and fiscal conservation, advanced by the state to justify the exclusion, would not be significantly impinged by impaneling one jury with sufficient alternates able to fully participate in the penalty phase. At the same time capital defendants would be assured that their guilt or innocence would be determined by a representative jury.

I

The majority recognizes the practicality of this solution. It rejects substitution of alternate jurors out of concern for the requirement that jurors "reach their consensus through deliberations which are common to all of them," which this court discussed in *People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742]. (Maj. opn., *ante,* at pp. 350-352.) I believe the concern based on *Collins* is misplaced in a situation, such as that at bench, where the penalty verdict must be decided separately from the verdict on guilt.

Let us look at *Collins.* There, after the cause had been submitted to the jury and deliberations among the jurors had begun, one of the jurors asked to be dismissed. The issue posed was whether substitution of an alternate

---

[1]The artless term "guilt phase includables" is used to describe these jurors.

during the jury's final deliberations violated a defendant's constitutional right to a unanimous verdict by 12 jurors. The court expressed concern that unless all 12 jurors fully participated in the deliberations the requirement of a unanimous verdict could not be met. The court concluded that the substitution did not necessitate a retrial. The constitutional mandate, according to the *Collins* court, is satisfied when: (1) the deliberations begin anew upon substitution of the alternate, (2) the jury actually is instructed to set aside past deliberations and begin anew, and (3) each of the 12 jurors reaching the verdict participates in the entire deliberative process. The procedure we suggest is consistent with *Collins*.

Penal Code section 190.1 provides that the question of the defendant's guilt shall first be determined. Thereafter, if the defendant is guilty of a crime which may subject him to the penalty of death, a separate proceeding is conducted on the question of penalty. At the penalty proceeding, the jury will hear further evidence relating solely to that issue. After having heard and considered argument by counsel, the jury must consider the evidence introduced at the separate penalty proceeding and weigh the aggravating and mitigating circumstances to determine the appropriate penalty. Thus, at the close of the penalty proceeding the jury must begin entirely new deliberations. These are based on consideration of new evidence which may not have been relevant at the guilt phase and on reconsideration of other matters presented at the guilt phase in light of the unique function of selecting punishment.

Under the proposal advanced in this dissent the 12 jurors who will determine the penalty will have heard all of the evidence presented at both the guilt and penalty proceedings and will have fully participated in the deliberations leading to the penalty determination. The jury will be instructed to disregard prior deliberations, and to begin anew after the guilt proceeding. A consensus on the penalty will be reached through deliberations which are the common experience of all of the jurors.

## II

The majority also suggests that using alternates will result in juries which are less than partial. According to the majority using the same jurors to decide both the guilt and penalty verdicts may be necessary to assure that the ultimate decisionmaker in capital cases acts with full recognition of the gravity of its responsibility. The concern appears to be that a juror may decide guilt with a foreknowledge that the onerous task of deciding the appropriate penalty will not be faced by that juror. The concern is misplaced. The jurors who have such strong convictions against the death penalty, the only ones who will not sit on the penalty phase, will surely be

cognizant of the gravity of their responsibility. The other jurors will, of course, participate in the penalty phase. The majority expresses no qualms as to the alternates.

The use of alternate jurors serves the state's interest in preserving administrative convenience. The alternates, empaneled with the original jurors, would hear the guilt phase evidence. Empaneling these alternates would not significantly delay the jury selection process because the number of those jurors who will actually sit on the guilt phase jury and are unable to serve on the penalty jury is likely to be small. Jurors who strongly oppose capital punishment may not be excluded from the penalty trial unless they make it "unmistakably clear" that they "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial." (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, at pp. 522-523, fn. 21 [20 L.Ed.2d 776, at p. 785, 88 S.Ct. 1770].) Of this small group many who have such strong convictions may likely be excluded at the outset by voir dire. They may (1) express a desire to have themselves excluded from participating in a capital trial, (2) be excluded on a peremptory challenge by the prosecution, or (3) be excluded for cause if they cannot render an impartial verdict on the issue of guilt.

The defendant on trial for a capital offense, I believe, has a right to have that group of people represented on the guilt jury which is impartial on the issue of guilt and is able to participate in the guilt determination. Despite its possible small number, it represents a distinctive segment of the community. Those potential jurors should not be systematically excluded from a jury which constitutionally must be representative of the community.

If capital punishment is to reflect the evolving standards of our society, the composition of the capital jury is crucial. There is no state interest which justifies excluding from the guilt jury those who will render an impartial verdict on the issue of guilt but who will not impose a penalty of death. The state interests advanced by the majority to justify the exclusion are served by impaneling one jury with sufficient alternates to participate in the penalty phase.

For these reasons I respectfully dissent.

Appellant's petition for a rehearing was denied March 27, 1984, and the opinion was modified to read as printed above. Richardson, J.,* participated therein. Bird, C. J., Mosk, J., and Reynoso, J., were of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.